# Richmond

R. C. Anderson v. Commonwealth of Virginia.

March 13, 1950.

Record No. 3670.

Present, Hudgins, C. J., and Gregory, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

· *William W. Berry* and *Albert O. Burks*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General*, and *Henry T. Wickham, Assistant Attorney General*, for the Commonwealth.

GREGORY, J., delivered the opinion of the court.

The accused, R. C. Anderson, was indicted for having produced an abortion upon the body of one Virginia Lee Hunter, in violation of Code, 1942 (Michie), section 4401, and was found guilty by the jury of an attempt and his punishment fixed at three years in the penitentiary. He was accordingly sentenced by the court.

Anderson is a Negro physician, practicing his profession in the town of Bedford. During the month of February, 1949, Gladys Morgan, a white woman, who resided in Lexington, Virginia, accompanied Miss Hunter, also white, to the residence of Anderson, in which he had his office. Gladys Morgan claimed that she had visited Anderson in the month of June, 1948, for the purpose of having an abortion produced upon her by him, which he did, and for that reason she directed Miss Hunter to him.

Miss Hunter was a resident of Norfolk. One John Brown had been having intimate relations with her for a period of more than a year prior to this time, and she had become pregnant by him. He was a brother of Gladys Morgan, and he called her on the telephone and made arrangements for her to take them to the accused for the purpose of

procuring an abortion upon Miss Hunter. Brown had previously procured certain drugs which he had given Miss Hunter to bring about a miscarriage but they failed to do so. Brown, Miss Hunter, and Billy Hightower, drove from Norfolk to Lexington on February 26, 1949, spent the night at Gladys Morgan's, and she, with the others, except Hightower, drove to Bedford the next day, which was Sunday. When they arrived at Anderson's home Gladys Morgan asked him if he would do the same for Miss Hunter that he had done for her, to which, according to her testimony, he agreed. Brown remained in the front room of the house. Miss Hunter and Gladys Morgan went into Anderson's office where Miss Hunter was introduced by Gladys Morgan to Anderson as her sister-in-law. A nurse was summoned and Miss Hunter was placed upon an operating table. Her body was draped with a sheet. Her testimony is that an instrument of some kind, which she did not see, was inserted in her private parts and there allowed to remain for about 5 minutes. This was accompanied by no pain, and the only sensation she experienced, according to her statement, was that it felt like a "kind of winding up inside".

Gladys Morgan said she arranged for the fee which Anderson first fixed at $500, but dropped to $75. $80 was left for him, they being unable to make the change. He made no record of the visit or the charge, though he admitted he kept books. The entire visit lasted from thirty to forty-five minutes.

The parties then returned to Lexington, arriving there about six p. m. Anderson had given Miss Hunter two pills which were to be used for the relief of pain. On the next day a Lexington physician was called to prescribe for Miss Hunter. He administered penicillin. They then returned to Norfolk where Miss Hunter became desperately ill and was sent to the hospital on March 3rd. There it was discovered that she had had a miscarriage. Dr. Beckert, a specialist in obstetrics and female surgery treated her. He said that the fetus had passed when he first examined her

and that he did not see it, but that the afterbirth and umbilical cord were present in the birth canal. The patient was bleeding profusely and received a blood transfusion. She had considerable temperature and her white blood count indicated that she had an infection.

Dr. Beckert testified that the use of drugs may produce an abortion in a small percentage of cases; that not having seen the fetus he was unable to state whether it was living or dead at the time it was expelled, and that ergot and like medicines were capable of killing the fetus within the uterus, but that he was unable to state what was the cause of the miscarriage in this case.

Anderson testified in his own behalf and his testimony was conflicting and contradictory. He admitted that he had treated Gladys Morgan and Miss Hunter; that he performed an external examination of Miss Hunter by percussion and by stethoscope, and that he gave her a bimanual examination; he detected no fetal heart beat. He said that he made an internal examination with the use of a speculum, an instrument designed to open the vaginal vault for the purpose of an examination of the uterus and the cervix. He described how he inserted this instrument. He also said that he used a cotton swab with a weak sterile solution to clean the vaginal areas for the examination and that his examination revealed that the cervix was eroded, red and dilated; he found evidence of hemorrhage from the uterus, and detected an odor of decomposition from which he concluded that the fetus was dead. He then gave Miss Hunter a hypodermic to assist in ridding her of the fetus which was required for the sake of her health.

Anderson admitted that he knew that Miss Hunter was pregnant, that she not only had told him that she was, but that as a result of his examination he found that she was pregnant. He also admitted that he knew that the fetus was in the uterus at the time he examined her, and that he could see it protruding from the uterus.

Dr. Beckert stated that it was difficult to determine when a fetus was dead; one indication is the odor that comes from the birth passage. He said, however, there were other tests, and that the most reliable is known as the rabbit test. This test is made, according to the doctor, by injecting the urine from the mother into a rabbit, and then by an examination of the ovaries of the rabbit one is able to determine the vitality of the fetus. He also stated that before an abortion is induced good practice would require this and other tests. A fetus may be alive at the time the acts prohibited by the statute are committed and dead at the time it is expelled by the miscarriage.

There are two assignments of error insisted upon here. One is the refusal of the court to instruct the jury that the burden was upon the Commonwealth to establish that Miss Hunter was pregnant with a *living* fetus at the time the alleged act was committed upon her. The other assignment is directed at the failure of the court to give an instruction on an attempt, which was offered by counsel for the accused. The court, however, did give an instruction on an attempt, but counsel contend that it was not sufficient and that the one offered by them should have been given.

In Virginia, until now, we have never passed upon the question of whether or not, in order to constitute an abortion under the statute, a fetus must be living at the time of the commission of the abortion. Outside of Virginia there is division of authority on the question. 1 C. J. S., Abortion, sec. 6(c). Where the death of the fetus is a defense those jurisdictions place the burden of proof on the accused. 1 Am. Jur., Abortion, sec. 49. Our statute, sec. 4401, in part, is as follows: "If any person administer to, or cause to be taken by a woman, any drug or other thing, or use any means, with intent to destroy her unborn child or to produce abortion or miscarriage, and thereby destroy such child or produce such abortion or miscarriage, he shall be confined in the penitentiary not less than three nor more than ten years. No person, by reason of any act mentioned * * *

shall be punishable where such act is done in good faith, with intention of saving the life of such woman or child. * * *" The latter part of the section is not pertinent here.

A close reading of the statute will disclose that it is in two parts. The first part deals with the destruction of an unborn child by administering to the woman any drug or other thing, or using any means with intent so to do. The second portion of the statute deals with performing these same acts with intent to produce and producing an abortion or miscarriage. Nowhere in the statute is there any requirement that the fetus be living at the time of the act in order to constitute a violation, but under the first portion the life of the fetus at the time of the act is presupposed from the words "destroy her unborn child." If dead it could not be destroyed.

We have had occasion to construe this statute in the recent case of *Coffman v. Commonwealth*, 188 Va. 553, 50 S. E. (2d) 431, but not with reference to the vitality of the fetus at the time of the abortion as contemplated by the second part of the statute.

In that case, which involved a violation of the first portion of the statute, Mr. Justice Buchanan, speaking for the court, adopted this definition of an abortion: "Abortion is defined as 'the expulsion of the fetus at so early a period of uterogestation that it has not acquired the power of sustaining an independent life.' Although there may be a technical distinction recognized in medicine between abortion and miscarriage, the words are usually synonymous in law. 1 Am. Jur., Abortion, sec. 2, p. 133; *Abrams* v. *Foshee*, 3 Iowa 274, 66 Am. Dec. 77, and note; 1 C. J. S., Abortion, sec. 1, p. 312; *Commonwealth* v. *Smith*, 213 Mass. 563, 100 N. E. 1010."

There it was admitted that the fetus was not expelled but the evidence of the Commonwealth disclosed that its destruction was caused by the death of the mother, and speaking of the intent, this was said: "Section 4401 forbids the use of any means with intent to destroy an unborn child

or to produce an abortion. The rule of *ejusdem generis* does not apply and the prohibition is all-inclusive against any means. 1 C. J. S., Abortion, sec. 5, pp. 316-7. The intent with which the means are used is the controlling factor. It seems clear from the language of the statute that more than one intended consequence is included. If only the intent to cause an abortion, in the sense of expulsion of the fetus, and the causing of such abortion, were meant to be covered, the words 'intent to destroy her unborn child', and 'thereby destroy such child' would be useless. It is not to be presumed that those words were used for no purpose and mean nothing in the statute. *Raven Red Ash Coal Corp.* v. *Absher*, 153 Va. 332, 149 S. E. 541."

The latter portion of the statute provides that if any person use any means with intent to produce an abortion or miscarriage, and produces an abortion or miscarriage, he is guilty thereunder. As we have already stated, the intent with which the means are used is the controlling factor. *Coffman* v. *Commonwealth, supra.* There was strong evidence tending to show that the accused intended to produce and did produce an abortion or miscarriage. Miss Hunter went there for that express purpose and no other. He was not Miss Hunter's physician. He was engaged to perform an illegal act for which he attempted to charge $500. He concluded that the fetus was dead without making the usual tests. The ordinary relation of physician and patient did not exist here. By his own testimony it is disclosed that he administered a medicine by hypodermic needle for the express purpose of causing the expulsion of the fetus. It is true he said he did this as a protection to her health, but the jury were well warranted in not accepting that statement. They were told in instructions 1 and 3 that if the action on the part of the accused was done in good faith, with the intention of saving the life of Miss Hunter, or if they had a reasonable doubt that such action on the part of the accused was done in good faith with said intention, he should not be found guilty. Thus the question of his good

faith and his intent of saving her life was placed squarely before the jury and they found adversely to that contention.

Cases from other jurisdictions are of no help. Our statute, which is unlike those of other States, and which has remained substantially the same since 1849, must be construed by its own particular language, and in the light of its obvious purposes. The intention of the lawmakers was to protect the health and lives of pregnant women and their unborn children from those who intentionally and not in good faith would thwart nature by performing or causing abortion and miscarriage.

Counsel for the accused has traced the statute back to the English common law, and has referred to the English statute. They say that our Code revisers of 1849 were familiar with the English statute, and to a large extent modeled the Virginia statute upon it but expressly refused to follow it in full, and that at the time of the revision of the Code of 1849 it appeared that the English statute required proof of two facts,—first, that the child be alive and the mother pregnant; and second, that the mother be "quick" with child, that is, that the child show detectable indication of such life by movement within the body of the mother, and that there the offense was primarily against the unborn child.

The English law on the subject is now governed by the Offenses Against the Person Act, 1861, which makes the attempt to cause a miscarriage by administering poison or other noxious things, or unlawfully using any instruments equally a felony, whether the woman be or be not with child, and no distinction is now made as to whether the fetus is or is not alive, legislation appearing to make the offense statutory, with the object of prohibiting any risk to the life of the mother. Encyclopedia Britannica, Vol. 1, p. 57, 14th Edition.

If the offense is against the mother as well as against the child, and we think it is, and the abortion is not procured to save her life, and it is not done in good faith, we conclude

that it makes no difference whether the fetus is dead or alive. It follows that instruction B offered by the petitioner was properly refused.

Upon an indictment for a felony an accused may be convicted of an attempt. See Code, 1942 (Michie), section 4922. The punishment for attempts to commit crime are embraced in Code, 1942 (Michie), section 4767. As we have already stated, the accused in this case was convicted of an attempt and not of the principal offense embraced in section 4401.

The petitioner contends that the court failed to properly instruct the jury upon an attempt. Counsel offered an instruction on this subject but it was refused. An instruction was granted by the court at the request of the Commonwealth, defining an attempt as applicable to this case, in general terms.

According to our view of the case, the court should not have given any instruction on the offense of an attempt because there was no evidence to sustain it. The evidence of the petitioner is quite sufficient to sustain the crime of producing an abortion. According to his own testimony he said that he used sponge forceps to swab the vaginal cavity, he examined her bimanually, and with an instrument known as the speculum. He said he observed her beginning to miscarry, and in order to encourage the miscarriage he gave her the hypodermic. In three days she had completed the miscarriage. These acts on his part did not amount to acts of preparation or to an attempt. They amounted to the commission of the principal offense, which he committed, not for the purpose of saving the life of the woman or the child, but for the fee he charged and collected.

The result of the verdict here, finding the accused guilty of an attempt, is to acquit him of the principal offense of abortion or miscarriage under section 4401. He cannot successfully maintain that he should not have been convicted of the lesser offense when the evidence shows clearly he was guilty of the principal offense. Under these cir-

cumstances it would appear that no instruction on an attempt would have been supported by the evidence, and therefore the one given at the request of the Commonwealth was harmless.

We said in *Bradshaw* v. *Commonwealth*, 174 Va. 391, at p. 397, 4 S. E. (2d) 752, "In criminal cases, as in all other cases, instructions should be based upon evidence, and one which in substance told the jury that they might find the accused guilty of involuntary manslaughter, in a case where murder in the first degree was established beyond all doubt by undisputed testimony, would be misleading. No jury should return such a verdict and hold, for example, that the deliberate giving of deadly poison in order to collect insurance was involuntary manslaughter. It is true that in such a case were it to so find, that verdict should be sustained, not because it is a proper verdict but because it amounts to an acquittal of murder in the first degree, and if not sustained the accused would go unpunished. *Burton & Conquest* v. *Commonwealth*, 108 Va. 892, 62 S. E. 376; *Bell* v. *Commonwealth*, 167 Va. 526, 189 S. E. 441; *Little* v. *Commonwealth*, 163 Va. 1020, 175 S. E. 767."

The principles announced in *Hicks* v. *Commonwealth*, 86 Va. 223, 9 S. E. 1024, 19 Am. St. Rep. 891, and *West* v. *Commonwealth*, 156 Va. 975, 157 S. E. 538, are not applicable here.

We therefore affirm the judgment of the trial court.

*Affirmed.*