# Richmond

ALBERT J. RUSSO v. COMMONWEALTH OF VIRGINIA.

June 13, 1966.

Record No. 6125.

Present, All the Justices.

Arthur E. Smith (*Thomas Keister Greer; Richard K. C. Sutherland; Hutcherson and Greer*, on brief), for the plaintiff in error.

M. Harris Parker, *Assistant Attorney General* (*Robert Y. Button, Attorney General*, on brief), for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

The defendant, Albert J. Russo, a medical doctor, was indicted for abortion performed on Phyllis Gaskins, in violation of § 18.1-62 of the Code.* A jury found him guilty as charged, fixed his punishment at five years in the penitentiary, and sentence was pronounced on him in accordance with the verdict.

On this appeal from the judgment of conviction, and under his assignments of error, the defendant contends that the "medical evidence" of induced abortion was not sufficient to support the verdict; that counsel for the Commonwealth made improper and prejudicial arguments; that inadmissible evidence was allowed to be introduced, and that the indictment was insufficient and his motion to quash it should have been sustained. These contentions will be discussed in that order.

The Commonwealth was, of course, not limited to "medical evidence" to support the verdict. We look to the whole evidence and view it with the conflicts in it and the fair inferences from it settled as determined by the jury. *Wright* v. *Commonwealth*, 196 Va. 132, 82 S.E.2d 603; *Crisman* v. *Commonwealth*, 197 Va. 17, 87 S.E.2d 796. The evidence to support the verdict was as follows:

Phyllis Gaskins, an eighteen-year-old girl and unmarried, was a

---

* "If any person administer to, or cause to be taken by a woman, any drug or other thing, or use means, with intent to destroy her unborn child, or to produce abortion or miscarriage, and thereby destroy such child, or produce such abortion or miscarriage, he shall be confined in the penitentiary not less than one nor more than ten years. No person, by reason of any act mentioned in this section, shall be punishable when such act is done in good faith, with the intention of saving the life of such woman or child."

member of the freshman class at Radford College. On Saturday, April 4, 1964, she called the defendant, Dr. Russo, whom she did not know, at his office in Salem, some forty-five miles away, and made an appointment to see him at his office the following Friday night, April 10. A college suite mate took her and they arrived at defendant's office about 7:30 p.m. She went there for the purpose of finding out whether she was pregnant. She told defendant that she had missed her period and would like to have an examination to see what was wrong. He examined her and told her she was then six weeks pregnant. She told him she was not married and did not want to have the baby. He told her he would like to help her and he gave her a prescription, which she had filled. He told her to take the pills and see if they would work, and if they did not to come back and he would make her have a miscarriage so she would not have the baby, but that it would cost $500.

The following Monday, April 13, Miss Gaskins went again to the defendant's office to tell him that she thought she could get the money by Saturday, and he told her to come back Saturday afternoon, April 18.

She was able to get a Western Union money order payable to her for $500. She endorsed it and took it to the defendant on Saturday, as arranged. The defendant, who also dealt in real estate, wrote on the back of the money order "Lot 22," endorsed it and received value for it at the bank.

On receipt of the $500 money order the defendant told Miss Gaskins to take her panties off, get up on the operating table and put her feet in the stirrups. She testified that "then he took a probe or some kind of an instrument but I couldn't see exactly what it was, and inserted that in me, and that is all I could see." She could only see that the instrument was silver colored.

After this instrument was inserted she "started bleeding a lot," and he gave her a sanitary towel to use until she got back to school. He gave her some capsules to take if she started getting a fever. She went back to the defendant's office on Monday, April 20, "and he did the same thing that he had done Saturday, he inserted some kind of a probe, and then he also put a rubber tube about twelve inches long, I I guess—I don't know—, and inserted that, and he said that was to cause pain or something like that to help bring on the miscarriage. And he said if I was to get a high fever or anything during the night or that my fever should go up to remove the tube

and wash it out and bring it back to him the next day." That night she had a headache and a very high temperature with chills. She stayed in bed next day, April 21, and her girl friends wanted to take her to the college infirmary, but she called defendant instead and told him her condition and he told her to come to him immediately if she possibly could, and if not to get a shot of penicillin from the doctor, "but not to let him examine me."

Accordingly Miss Gaskins called a cab "to get there the quickest way I could," and arrived at defendant's office about noon that day. Defendant gave her penicillin and some capsules for her fever, and she spent the afternoon until about five o'clock on a bed in his office. On her return to the college she was taken to the infirmary and next day, April 22, was taken to the Radford Hospital, where she told the college physician, the president of the college and the dean of the college that an abortion had been performed on her. There a miscarriage took place on the night of April 24.

At the hospital she was examined on April 22 by Dr. Elswick and by Dr. Haas on April 23. These two doctors were specialists in obstetrics and gynecology and practiced as partners. Both took care of the hospital patients.

Dr. Elswick testified that Miss Gaskins gave the history of an attempted inducement of abortion. "The pelvic examination revealed a uterus, a womb with two and a half to three months pregnancy size, and the mouth of the womb had been opened, obviously mechanically by some means, so that the outermost mouth of the womb was opened, but the inner mouth was still closed." He said their diagnosis on admission was a threatened abortion secondary to an attempted criminal abortion, and that the ultimate diagnosis on discharge was "complete abortion, septic, secondary to criminal inducement."

He further testified: "Under the definition of abortion, medically speaking there are several different kinds. A spontaneous abortion is one that terminates as the result of an abnormal, natural cause rather than one that is induced by an individual either therapeutically or criminally. This one we felt was criminal abortion under our definition." Dr. Elswick explained that a therapeutic abortion is the termination of a pregnancy to preserve the health of the mother. Defendant's counsel stated that there was no suggestion here of any therapeutic abortion.

Dr. Elswick testified also that the uterus of Miss Gaskins was

retroflexed and "this means that it was bent on itself and had fallen back. In the normal position the womb is up, and it had fallen back at the time of my examination." But, he said, this could not have existed on April 10 when defendant first examined her because examination of the fetus after the abortion showed that apparently the membrane had ruptured, or had been ruptured, and the fluid from the pregnancy had leaked out, allowing the uterus to obtain a smaller size and fall back out of position. He said that the retroflexed position of the uterus seldom, if ever, results in abortion; that it can, but almost never does. Miss Gaskins testified that when defendant examined her on April 10 he said nothing about anything being wrong with her uterus.

On cross-examination Dr. Elswick was asked what "cardinal signs" he found in reference to a criminal abortion. He replied: "Well, there was something that was very distinct as far as diagnosis of a criminal abortion, and this is the fact that the outermost mouth of the womb had opened, and the innermost mouth was still closed. With a spontaneous abortion which you have been referring to the innermost mouth of the womb opens first and the outermost mouth of the womb opens secondary to this."

The testimony of Dr. Haas was in agreement with that of Dr. Elswick. He testified that at the time Miss Gaskins was admitted to the hospital abortion was inevitable, meaning that it could not be saved; and that he diagnosed it as induced septic abortion, meaning that some external force was used on the uterus. He had never seen or heard of a retroverted uterus causing an abortion, and it did not cause this one, he said.

For the defendant, Dr. William Joseph Ellis testified that he engaged in the general practice of medicine in Covington, including obstetrics, and was associated with the Alleghany Memorial Hospital there. He was shown a copy of the hospital record of the Radford Hospital with reference to Miss Gaskins, which he had previously examined. He was then asked whether there was anything in that record consistent with criminal abortion other than the history related by the patient. He replied, "No, sir, there isn't." He disagreed with Doctors Elswick and Haas in their conclusions, and stated his opinion to be that in order to effect an abortion by instrumentation the internal os (mouth of womb) would have to be entered; that a retroflexed uterus can cause an abortion, but he conceded that it almost never does.

The defendant testified that he had been practicing medicine in Salem for twenty-three years as a general practitioner; that he did not perform any abortion on Miss Gaskins; that she came to see him first on April 10 to find out whether she was pregnant; that he then made a pelvic examination and was not sure she was pregnant; that he gave her a prescription "to see if it would start her" but he did not use any kind of an instrument; that she came by his office on April 13 to talk to him about the possibility of an abortion, "which I wouldn't do, and she said that she would offer me $500 if I would take care of her if she got started. * * I told her that I couldn't do anything; that if she could get started that I could go ahead and follow up on it." He further testified that when Miss Gaskins came back to see him on April 18, he did not use any instrument on her to cause an abortion; that he used a speculum to examine the uterus, which he thought was retroflexed, and he assumed "that we were going to deal with possibly a spontaneous abortion if nothing was done." When she came to see him on Monday, April 20, she was running a fever and he just gave her penicillin and some pills for fever, and that was all he did.

He said that when Miss Gaskins came back to see him on April 18 she gave him $500, for which he was "to look after her for complete care," and that she understood that "either she was to start by herself or someone else was to start her." He testified that the reason he put "Lot 22" on the $500 money order was to avoid publicity, to save the name of the girl and of her family, and of her college. Asked if he was somewhat interested in the $500, he replied, "She offered it to me. I would have taken a thousand if she gave it to me. It's worth it to handle any kind of a case like this."

Very clearly the verdict of the jury was well supported by the evidence and the motions to strike and to set aside the verdict were properly overruled.

The defendant next insists that improper and prejudicial arguments were made by counsel representing the Commonwealth. His objections, for the most part made here for the first time, were numerous, but only the following require any discussion:

The special attorney for the Commonwealth, opening the argument, felt the urge to tell the jury that they had "the burden of this wonderful jury system" which afforded the accused the presumption of innocence, followed by the statement: "Yet if we acquit this man today there will be a line at 21 College Avenue,

which will foster this very illegal procedure which the law seeks to curb. We will say, 'Hurrah, let it be, illegality there is a premium.' " After the conclusion of this oration defendant's counsel asked to see the court in chambers and there stated that he did not interrupt Mr. Lutins because he preferred not to, but that he excepted to his argument "about if you acquit this man what would happen", and he asked the court to declare a mistrial. The court properly overruled the motion because the objection came too late.

Objection to improper argument of counsel should be made at the time and the court should be requested to instruct the jury to disregard it. 2 Mich. Jur., Argument and Conduct of Counsel, § 21, p. 83, and 1965 Cum. Supp., p. 16. Failure to make timely objection ordinarily constitutes a waiver. *State* v. *Cirullo*, 142 W. Va. 56, 93 S.E.2d 526. The effect of improper argument may usually be removed by the court if objected to when made. Counsel cannot remain silent when improper argument is made and after the whole argument is concluded and in the absence of the jury successfully move for a mistrial.

█ The Commonwealth's attorney began his closing address to the jury in this fashion: "May I say first, to you, having been Commonwealth's Attorney of this County for some twenty odd years; having gone into office the first time in 1932, and having been there ever since, that if I did not believe the evidence in this case proved his guilt, of Dr. Russo, beyond a reasonable doubt, I would withdraw right here and now."

Defendant's counsel then said: "Your Honor, what the Commonwealth's Attorney may believe or may not believe has no bearing in this case, and I object to it."

The court said: "Let's keep our argument to the evidence in the case and the instructions of the Court. It's up to the Jury what they will believe from the evidence in the case."

The argument was improper, the court's rebuke was milder than it should have been, but apparently it was satisfactory to defendant's counsel as he made no further request and took no exception.

"We have repeatedly said that in order to secure the right to have a question reviewed on appeal, objection to the trial court's ruling must be made and exception taken at the time the occasion arises, otherwise the point is waived. * * " *Gaumont* v. *Highway Commissioner*, 205 Va. 223, 225, 135 S.E.2d 790, 791.

It is to the ruling of the court that an objection or exception must

be directed. If the party objecting intends to rely on an erroneous ruling in the trial court as a ground for reversal in this court, he must make exception thereto in the lower court. *Gall* v. *Tea Company*, 202 Va. 835, 120 S.E.2d 378. In that case we said:

"During the course of a trial many objections are made which at first blush may appear to counsel to have some substance, but after argument of counsel and the court has made its ruling the original objector is sometimes convinced that the court's ruling is correct and he has no intention of further relying on the point raised. The failure of counsel to save the point, or to take an exception, may well lull the court into believing that counsel acquiesced in its ruling. Hence, the requirement of the rule has a salutary effect." 202 Va. at 838, 839, 120 S.E.2d at 381.

The jury interrupted its deliberation to inquire of the court "as to whether if the outer os is penetrated whether it will cause a chain reaction that will cause an abortion." The court replied that the evidence had been concluded and that there was no further information that the court could give them. No objection was made by the defendant to this ruling.

Later the jury asked to see the transcript of the evidence that the attorneys used during their argument. The defendant objected and the request was refused. The court informed the jury that the transcript was not complete but only the evidence of two witnesses and it would be improper for the jury to have it.

The defendant now argues that he was prejudiced by these occurrences, but he cannot be heard in this court with respect to these rulings which he did not object to in the trial court, and one of which was made at his request.

Defendant next contends that the indictment charged him with using and employing "a certain instrument" on the prosecuting witness, and consequently evidence as to the use of a drug should not have been admitted. Miss Gaskins testified, without objection, that defendant first gave her pills to see if they would work. The druggist who filled the prescription said they were ergo apiol, used to control bleeding and in labor to cause contraction of the uterus. Defendant testified that it would not bring on an abortion. This evidence formed a part of the whole transaction, was relevant to the intent of the defendant, which is an element of the crime defined by the statute, *Anderson* v. *Commonwealth*, 190 Va. 665, 58 S.E.2d 72, and was admissible for these purposes. Moreover, it was not

objected to in the court below and defendant cannot be heard to object to it in this court.

Defendant's final contention is that the indictment was invalid because it failed to negative the provision of the statute that no person shall be punished under it if he acted in good faith with the intention of saving the life of the mother or child. This is an exception made in a substantive clause subsequent to the enacting clause of the statute, and we hold it to be a matter of defense for the defendant to assert and not for the indictment to deny. *Devine* v. *Commonwealth*, 107 Va. 860, 60 S.E. 37; *Cochran* v. *Commonwealth*, 122 Va. 801, 94 S.E. 329.

We find no reversible error in the trial and the judgment of conviction is affirmed.

*Affirmed.*