Richmond

## CHRIS SIMOPOULOS, M.D.

### V.

## COMMONWEALTH OF VIRGINIA

April 24, 1981.

Record No. 801107.

Present: Carrico, C.J., Harrison, Cochran, Poff, Compton, and Thompson, JJ.

*Roy Lucas (John H. Obrion; Lucas & Miller, P.C.; Browder, Russell, Little, Morris & Butcher,* on brief), for appellant.

*Thomas D. Bagwell, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

Chris Simopoulos, a medical doctor licensed to practice obstetrics and gynecology, appeals from a judgment convicting him of a violation of the abortion statutes. The trial court heard the evidence without a jury and sentenced him to two years' imprisonment suspended during good behavior upon condition he serve 30 days in jail.

P. M., a 17 year-old female, made an appointment to see the defendant at his clinic on November 8, 1979. She told him that she was pregnant, that she was not married, and that she had decided to have an abortion. The defendant inquired whether she had discussed the matter with her parents, and she replied that she had been afraid to do so. The defendant examined her, informed her that she was five and one-half months pregnant, and agreed to perform an abortion by means of an injection of a "saline solution".[1] P. M. told him

---

[1] This is a reference to saline amniocentesis, a means commonly employed in second-trimester abortion procedures. It was described as follows in a medical journal article offered at a pre-trial hearing:

"The technic utilized has been uniform. The patient assumes the supine position, and the abdomen is exposed. No premedication is used. The abdomen is cleansed, and a point representing the middle of the fundus of the uterus is identified. The skin, fascia and peritoneum are then anesthesized with 1 or 2%

that she intended to deliver the fetus in a motel, and the defendant assured her that "it was okay".

On the morning of November 10, P. M. returned with her boyfriend to the clinic and, using money she had acquired through her VISA credit card, she paid the agreed fee of $475. The defendant administered a local anaesthetic, injected a saline solution into her amniotic cavity, and gave her a "Post-Injection Information" sheet and a prescription for percodan, an analgesic. The sheet advised her that she had undergone "a surgical procedure" and warned her of "a wide range of normal reactions", including contractions, backache or tenderness at the bottom of the abdomen, nausea, thirst, dizziness, expulsion of amniotic fluid, rupture of "the bag of waters", and bleeding. The sheet directed her to abstain from alcoholic beverages and sexual activity, to call the doctor if "heavy" bleeding began, and to come to the hospital when labor contractions became frequent or when the bag of waters broke.

That afternoon, P. M. and her boyfriend filled the prescription and rented a room in a motel near the clinic. P. M.'s boyfriend stayed with

---

lidocaine. The amniotic cavity is entered with a 14-gauge thin-walled needle, and the stylet is removed. If a free flow of amniotic fluid ensues, a No. 5F Teflon catheter is threaded through the needle several centimeters beyond its tip. . . . The needle is then removed, and the rest of the procedure is carried out through the catheter.

"An effort is then made to remove all of the fluid in the uterus. After this is done, a 20% NaCl (sodium chloride) solution is injected into the uterus. If fluid is not obtained easily, an exchange infusion is performed—saline is instilled and then an equal amount of fluid is removed. This process is repeated until the operator is certain that there is sufficient NaCl within the amniotic cavity. The maximum quantity injected should be 200 ml, which is 40 g of NaCl. A smaller volume is injected into smaller uteri when less fluid has been aspirated. Although the minimum quantity necessary to terminate all pregnancies has not been determined, we estimate that not less than 120 ml of 20% solution should be injected.

"At the end of the procedure, one million units of aqueous penicillin is instilled. In addition to providing prophylaxis, this instillation clears the catheter of the salt solution which is caustic to the peritoneum. The patient should experience no discomfort during the procedure.

"Symptoms of hypernatremia—headache, heat, thirst, numbness and tingling of the fingers—are an absolute indication for the operator to stop to re-evaluate the procedure. If the patient feels pain when saline is being injected, then the solution is being injected into tissue and, once again, the procedure must be interrupted and re-evaluated. The average time used for the entire process is 20 minutes."

Schulman, et al, "Outpatient Saline Abortion", 37 *Obstetrics & Gynecology* 521, 522 (1971).

her until 3:00 a.m. the next morning, returned at noon, and left again at 10:00 p.m. that night. Shortly after midnight, P. M. experienced the onset of labor. About 11:00 a.m. that morning, she expelled the fetus, placed it and the afterbirth in a bathroom trashcan, and left for home. P. M. testified that she had eaten "some peanut butter and jelly sandwiches" and smoked a few cigarettes while awaiting her labor. She denied that she had ingested any drugs or medication except the percodan. She admitted that she never intended to abort in the hospital. Asked if the defendant had instructed her to abort in a motel, she said that "[h]e told me that it was possible, that I didn't have to go to a hospital" and "[h]e made it perfectly clear what he meant." Responding to another question, she denied that the defendant had promised to meet her at the hospital after the contractions started.

In the course of our opinion, we will detail other facts relevant to the multiple issues framed on appeal. These include the validity of the indictment, the sufficiency of the evidence to prove criminal intent and causation, the denial of discovery motions, and the exclusion of certain testimony. Aside from the constitutional questions underlying these issues, the defendant questions the constitutionality of the hospital requirement of the statutes under which he was indicted and convicted.

## I. CONSTRUCTION OF THE STATUTES

The defendant urges us to construe Article 9, Chapter 4, Title 18.2 of the Code as a whole. Doing so, we paraphrase the eight statutes set out in the margin.[2]

---

[2]

§ 18.2-71. **Producing abortion or miscarriage, etc.; penalty.**—Except as provided in other sections of this article, if any person administer to, or cause to be taken by a woman, any drug or other thing, or use means, with intent to destroy her unborn child, or to produce abortion or miscarriage, and thereby destroy such child, or produce such abortion or miscarriage, he shall be guilty of a Class 4 felony. (Code 1950, § 18.1-62; 1960, c. 358; 1970, c. 508; 1975, cc. 14, 15.)

§ 18.2-72. **When abortion lawful during first trimester of pregnancy.**—Notwithstanding any of the provisions of § 18.2-71, it shall be lawful for any physician licensed by the Virginia State Board of Medicine to practice medicine and surgery, to terminate or attempt to terminate a human pregnancy or aid or assist in the termination of a human pregnancy by performing an abortion or causing a miscarriage on any woman during the first trimester of pregnancy. (1975, cc. 14, 15.)

§ 18.2-73. **When abortion lawful during second trimester of pregnancy.**—Notwithstanding any of the provisions of § 18.2-71 and in addition to the provisions of § 18.2-72, it shall be lawful for any physician licensed by the Virginia State Board of Medicine to practice medicine and surgery, to terminate or attempt to terminate

1. A person who destroys a woman's unborn child, or causes her to abort or miscarry, by the use of any substance or by any other means with intent to achieve such a result is guilty of a Class 4 felony, unless the procedures employed and the result achieved are made lawful by other provisions of Article 9. § 18.2-71.

2. The process criminalized by § 18.2-71 is lawful when performed in the first trimester of pregnancy. § 18.2-72.

a human pregnancy or aid or assist in the termination of a human pregnancy by performing an abortion or causing a miscarriage on any woman during the second trimester of pregnancy and prior to the third trimester of pregnancy provided such procedure is performed in a hospital licensed by the State Department of Health or under the control of the State Board of Mental Health and Mental Retardation. (1975, cc. 14, 15.)

§ 18.2-74. When abortion or termination of pregnancy lawful after second trimester of pregnancy.—Notwithstanding any of the provisions of § 18.2-71 and in addition to the provisions of §§ 18.2-72 and 18.2-73, it shall be lawful for any physician licensed by the Virginia State Board of Medicine to practice medicine and surgery to terminate or attempt to terminate a human pregnancy or aid or assist in the termination of a human pregnancy by performing an abortion or causing a miscarriage on any woman in a stage of pregnancy subsequent to the second trimester provided the following conditions are met:

(a) Said operation is performed in a hospital licensed by the Virginia State Department of Health or under the control of the State Board of Mental Health and Mental Retardation.

(b) The physician and two consulting physicians certify and so enter in the hospital record of the woman, that in their medical opinion, based upon their best clinical judgment, the continuation of the pregnancy is likely to result in the death of the woman or substantially and irremediably impair the mental or physical health of the woman.

(c) Measures for life support for the product of such abortion or miscarriage must be available and utilized if there is any clearly visible evidence of viability. (1975, cc. 14, 15.)

§ 18.2-74.1. Abortion, etc., when necessary to save life of woman.—In the event it is necessary for a licensed physician to terminate a human pregnancy or assist in the termination of a human pregnancy by performing an abortion or causing a miscarriage on any woman in order to save her life, in the opinion of the physician so performing the abortion or causing the miscarriage, §§ 18.2-71, 18.2-73 and 18.2-74 shall not be applicable. (Code 1950, § 18.1-62.3; 1970, c. 508; 1975, cc. 14, 15.)

§ 18.2-75. Conscience clause.—Nothing in §§ 18.2-72, 18.2-73 or 18.2-74 shall require a hospital or other medical facility or physician to admit any patient under the provisions hereof for the purpose of performing an abortion. In addition, any person who shall state in writing an objection to any abortion or all abortions on personal, ethical, moral or religious grounds shall not be required to participate in procedures which will result in such abortion, and the refusal of such person, hospital or other medical facility to participate therein shall not form the basis of any claim for damages on account of such refusal or for any disciplinary or recriminatory action against such person, nor shall any such person be denied employment because of such objection or refusal. The written objection shall remain in effect

3. Such process is lawful during the second trimester when performed by a licensed physician in a licensed hospital. § 18.2-73.

4. In the third trimester, the abortion process is lawful if: (a) it is performed by a licensed physician in a licensed hospital; (b) three physicians certify of record that a continuation of the pregnancy is likely to cause the woman to die or suffer substantial and permanent impairment of mental or physical health; and (c) fetal life support measures are available and utilized when there is clearly visible evidence that the fetus is viable. § 18.2-74.

5. The proscribed process is lawful at any time during pregnancy if, in the opinion of the attending physician, such process is necessary to save the woman's life. § 18.2-74.1.

6. Hospitals and physicians are not required to perform any process authorized by Article 9, and persons who register conscientious objections may refuse to participate in the procedures and are protected against damage suits and other recriminatory actions growing out of such refusal. § 18.2-75.

7. No process otherwise authorized under Article 9 may be performed without the informed written consent of the woman or, when she has been adjudged incompetent, one authorized to act for her. § 18.2-76.

8. Any person who promotes or induces the performance of a

---

until such person shall revoke it in writing or terminate his association with the facility with which it is filed. (Code 1950, § 18.1-63.1; 1974, c. 679; 1975, cc. 14, 15.)

§ **18.2-76. Informed consent required.**—Before performing any abortion or inducing any miscarriage or terminating a pregnancy as provided for in §§ 18.2-72, 18.2-73 or 18.2-74, the physician shall obtain the informed written consent of the pregnant woman; provided, however, if such woman shall be incompetent as adjudicated by any court of competent jurisdiction or if the physician knows or has good reason to believe that such woman is incompetent as adjudicated by a court of competent jurisdiction, then only after permission is given in writing by a parent, guardian, committee, or other person standing in loco parentis to such incompetent, may the physician perform such abortion or otherwise terminate the pregnancy.

The physician shall inform the pregnant woman of the nature of the proposed procedure to be utilized and the risks, if any, in her particular case to her health in terminating or continuing the pregnancy. Code 1950, § 18.1-62.1; 1970, c. 508; 1972, c. 823; 1975, cc. 14, 15; 1979, c. 250.)

§ **18.2-76.1. Encouraging or promoting abortion.**—If any person, by publication, lecture, advertisement, or by the sale or circulation of any publication, or through the use of a referral agency for profit, or in any other manner, encourage or promote the performing of an abortion or the inducing of a miscarriage in this State which is prohibited under this article, he shall be guilty of a Class 3 misdemeanor. (Code 1950, § 18.1-63; 1960, c. 358; 1972, c. 725; 1975, cc. 14, 15.)

process prohibited by Article 9 is guilty of a Class 3 misdemeanor. § 18.2-76.1.

## II. VALIDITY OF THE INDICTMENT

Referencing § 18.2-71, the indictment charged that the defendant "did unlawfully and feloniously, during the second trimester of pregnancy and outside of a hospital licensed by the State . . . use means upon a white female, aged 17, with the intent to produce abortion and thereby destroy her unborn child."

In a pre-trial motion to dismiss, the defendant alleged that the indictment "fails to state a valid offense". On appeal, he raises three challenges to the validity of the indictment.

### A. *Criminal Intent*

First, the defendant points out that the indictment did not charge that he acted "with the specific intent that the patient abort outside the hospital", and, he says, the evidence failed to establish such intent. Construing §§ 18.2-71, -73 together, the defendant maintains that, absent such a charge, the indictment is fatally defective.

The defendant's construction rests upon his impression that the definition of "abortion" contemplated by Article 9 is "expulsion of the fetus". That is a misimpression. "[T]he crime denounced is not limited to abortion in its narrow meaning of expulsion of the fetus, but includes . . . the use of any means with intent to destroy an unborn child, resulting in the destruction of such child." *Coffman* v. *Commonwealth*, 188 Va. 553, 561-62, 50 S.E.2d 431, 436 (1948). Both the means and the ensuing process, though proscribed by § 18.2-71, are made lawful by § 18.2-73 when performed in the second trimester, "provided such procedure is performed in a hospital". Dr. Peter Soyster, a practicing gynecologist, agreed at trial that the injection of a saline solution into the amniotic cavity of a pregnant woman is "a procedure to terminate her pregnancy". In our view, the statutory proviso applies to all procedures performed during the entire process, including the means employed with intent to initiate the process. The indictment expressly charged that the defendant employed such means with such intent. It was unnesessary to charge that he intended his patient to expel the fetus outside a hospital.

### B. *Duty to Preserve Fetal Life*

Because the statute referenced by the indictment forbids destruction of the fetus, the defendant argues that the indictment un-

consitutionally burdens him with a duty to preserve the life of the fetus. It is true that a statute which imposes a duty upon a physician to take affirmative action to preserve a fetus, irrespective of the stage of pregnancy and the viability of the fetus, is constitutionally impermissible. *Planned Parenthood of Missouri* v. *Danforth,* 428 U.S. 52, 83 (1976). But after viability, the sovereign has a "compelling interest" sufficient to justify regulation reasonably designed to preserve the life of the fetus. "If the State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother." *Roe* v. *Wade,* 410 U.S. 113, 163-64 (1973).

We do not agree that the statutory proscription against destruction of the fetus is a command to preserve it. While § 18.2-74(c) requires a physician to utilize fetal life support measures during the third trimester "If there is any clearly visible evidence of viability[3]", nothing in Article 9 imposes such an affirmative duty during the pre-viable stages of pregnancy, and we find no merit in the defendant's second argument.

### C. *Medical Necessity Defense*

 In a third argument, the defendant contends that the indictment is defective because it "does not attempt to negate the exception . . . of a medical necessity to treat the patient". This omission, the defendant says, shifts the burden of proving the exception to him in violation of the Supreme Court's ruling in *United States* v. *Vuitch,* 402 U.S. 62 (1971). There, the accused was charged with violation of a statute in which the enacting clause proscribed abortion "unless the same were done as necessary for the preservation of the mother's life or health". *Id.* at 67-68. The Court stated and then applied the rule that "when an exception is incorporated in the enacting clause of a statute, the burden is on the prosecution to plead and prove that the defendant is not within the exception". *Id.* at 70.

But when, as here, the exception is "made in a substantive clause

---

[3] In *Colautti* v. *Franklin,* 439 U.S. 379 (1979), the Supreme Court reviewed a statute which imposed a fetal-preservation duty upon a physician if he determined that the fetus "is viable . . . or may be viable". *Id* at 380, n. 1. Finding that "it is unclear whether the statute imports a purely subjective standard, or . . . a mixed subjective and objective standard" and that "it is uncertain whether the phrase 'may be viable' simply refers to viability . . . or whether it refers to an undefined penumbral or 'gray' area prior to the stage of viability", *id.* at 391, the Court struck down the statute as impermissibly vague. There is nothing unclear or uncertain in the language of Code § 18.2-74(c), and the standard it prescribes is purely objective.

subsequent to the enacting clause of the statute, . . . we hold it to be a matter of defense for the defendant to assert and not for the indictment to deny." *Russo* v. *Commonwealth,* 207 Va. 251, 259, 148 S.E.2d 820, 826, *cert. denied,* 386 U.S. 909 (1967).

The rule in *Russo* is not inconsistent with that in *Vuitch*. Once a defendant invokes § 18.2-74.1 as a defense, the Commonwealth has the burden of negating maternal health necessity beyond a reasonable doubt. In a related argument, the defendant says that he raised the defense in his testimony and that the Commonwealth's evidence was insufficient to establish the absence of necessity. The defendant testified that his patient appeared "upset" and "depressed" when he examined her and that he became concerned about the possibility of suicide. But his patient, who acknowledged that her principal concern was to abort without her parents' knowledge, testified that she was "[s]cared, but nothing else." Furthermore, the defendant's handwritten notes in the clinic's records described P. M.'s condition as "normal" and showed that the saline procedure was "performed without any complications". We find such evidence fully sufficient to refute any claim of maternal health necessity.

## III. CAUSATION

Attacking both the validity of the indictment and the sufficiency of the evidence, the defendant declares that the Commonwealth failed to allege and to prove "that instillation of the saline solution actually caused the woman to abort the fetus." But "[a] close reading of [§ 18.2-71] will disclose that it is in two parts." *Anderson* v. *Commonwealth,* 190 Va. 665, 671, 58 S.E.2d 72, 74 (1950). The defendant reads only one part. Affirming a conviction in a case where the expectant mother died and the fetus was never expelled, we said:

> "[M]ore than one intended consequence is included. If only the intent to cause an abortion, in the sense of expulsion of the fetus, and the causing of such abortion, were meant to be covered, the words 'intent to destroy her unborn child,' and 'thereby destroy such child', would be useless. It is not to be presumed that those words were used for no purpose and mean nothing in the statute."

*Coffman* v. *Commonwealth, supra,* 188 Va. at 561, 50 S.E.2d at 435. Given this construction of the statute, the Commonwealth had the option of alleging and proving that the saline injection caused *either* the death of the fetus *or* the expulsion of the fetus.

By referencing the statute, the indictment fairly charged that the defendant's intentional act had caused the destruction of the fetus. Assessing the evidence, we note that the defendant readily acknowledged that he administered the saline solution with intent to terminate pregnancy and that he realized that the procedure would destroy the fetus. P. M. testified that, before she left the clinic, "he told me . . . that the fetus was destroyed". The medical examiner who performed the autopsy reported that the fetus was "born dead".

Absent evidence of any other causative factor, we are of opinion that the evidence was sufficient to show that the saline injection caused the destruction of the fetus. While it is reasonable to infer that the fetus was expelled because it was dead, we need not decide whether the Commonwealth proved a casual connection between the injection and the expulsion. That question is immaterial to the offense with which the defendant was charged.

## IV. PRE-TRIAL DISCOVERY REQUESTS

 In pre-trial motions, the defendant made several general and specific requests for discovery. The trial court ruled that "I am going to require [the Commonwealth's Attorney] to give you everything . . . that in any way could be exculpatory." The Commonwealth's Attorney declared that he had no exculpatory information.

On appeal, the defendant complains that the Commonwealth withheld an extra-judicial statement the patient made to the police and "the names of two important witnesses", one, the patient's boyfriend, and the other, the physician who examined her at a military hospital a few days after the fetus was expelled.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment. . . ." *Brady* v. *Maryland,* 373 U.S. 83, 87 (1963). Due process requires disclosure when the evidence requested is such as "would tend to exculpate [the accused] or reduce the penalty". *Id.* at 88.

The defendant maintains that the information he sought was material to show whether the expulsion resulted from some cause other than the saline injection.[4] While we note that the defendant did not consider the information sufficiently important to seek it by subpoen-

---

[4] Arguing his motions in the court below, he explained that the information was necessary to determine if his patient had "had any other procedure performed that could have caused the expulsion or if she took any drug or did anything of any nature that would be an intervening superseding cause".

ing the records of the military hospital or by interrogating the knowledgeable witnesses at the preliminary hearing or at trial, we will assume that P. M.'s statement and the names of the boyfriend and the physician were matters relevant to the question whether the saline injection caused the expulsion of the fetus.[5] But, as we have said, since the evidence of record is sufficient to prove that the injection caused the destruction of the fetus, that question is immaterial to the offense charged in the indictment. It follows that the information requested was not constitutionally material to guilt or punishment, and we reject the defendant's complaint.

## V. THE HOSPITAL REQUIREMENT

The principal constitutional challenge is addressed to the hospital requirement of § 18.2-73. The defendant's attack is two-fold. First, he argues that the requirement violates the Due Process clause because, he says, it is not reasonably related to maternal health and, therefore, transcends the regulatory powers of the state. Second, he contends that it limits a pregnant woman's access to medical care, and thus, abridges her constitutional right to choose abortion over maternity.

■■■ In the definition of a woman's right to abort, the watershed case is *Roe* v. *Wade,* 410 U.S. 113 (1973). There, the Supreme Court, referring to the First, Fourth, Fifth, Ninth, and Fourteenth Amendments as "the roots" of a constitutional right of privacy, held that the right "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.* at 153. Classifying that right as one of the "fundamental rights", the Court said that state "regulation limiting these rights may be justified only by a 'compelling state interest' ". *Id.* at 155. Balancing the personal right of privacy against the state's power to regulate, the Court explained:

"[T]he State does have an important and legitimate interest in preserving and protecting the health of the pregnant woman . . . and . . . it has still *another* important and legitimate interest in protecting the potentiality of human life. These interests are separate and distinct. Each grows in substantiality as the woman approaches term and, at a point during pregnancy, each becomes 'compelling.'

---

[5] "The mere possibility that an item of undisclosed information might have helped the defense . . . does not establish 'materiality' in the constitutional sense." *United States* v. *Agurs,* 427 U.S. 97, 109-10 (1976).

"With respect to the State's important and legitimate interest in the health of the mother, the 'compelling' point . . . is at approximately the end of the first trimester. This is so because of the now-established medical fact . . . that until the end of the first trimester mortality in abortion may be less than mortality in normal childbirth. It follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health. Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like.

"This means, on the other hand, that, for the period of pregnancy prior to this 'compelling' point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State."

"With respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability. . . ."

*Id.* at 162-63.

*Doe* v. *Bolton,* 410 U.S. 179 (1973), was decided the same day as *Roe.* Finding that the evidence adduced at trial was insufficient to show that a hospital requirement in a Georgia statute was reasonably related to maternal health, the Court ruled that the regulation was invalid "because it fails to exclude the first trimester of pregnancy". *Id.* at 195. Article 9 of the Virginia Code excludes the first trimester; the hospital requirement applies to the second and third trimesters only. Under the principles and the standard of review announced in *Roe* and *Doe* we consider whether the evidence in this case supports a conclusion that "the regulation reasonably relates to the preservation and protection of maternal health." *Roe,* 410 U.S. at 163.

## A. *Maternal Health*

Contending that it does not, the defendant points to the testimony of several medical experts. Dr. Harold Schulman testified that saline

injections are often administered in ill-equipped treatment rooms at hospitals from which the patient is discharged to await labor. He suggested that hospitalization during the waiting period is not necessarily wise and could be dangerous to an expectant mother. He mentioned the possibility that some members of a hospital staff might be unsupportive or critical of unwed mothers and some might attempt to hasten expulsion by manipulation or instrumentation and thereby cause uterine or cervical perforation. A study he conducted showed that 65 percent of those injected as outpatients expelled the fetus at home, enroute to the hospital, or upon arrival and thereafter required no hospitalization.

Yet, on cross-examination, Dr. Schulman conceded that the saline injection procedure entails certain risks which make it necessary to observe the patient to "see if there are any unusual reactions to the instillation of the solution." Such reactions may occur "for some unexplained reason" or when "a disproportionate amount of the salt solution somehow gets into her blood stream." This can cause "thirst or headache, nausea, vomiting and on rare occasions the uterus will abruptly begin to swell." Dr. Schulman agreed that the saline solution can interfere with the clotting capacity of the blood and result in extensive hemorrhaging. He characterized this as a "very serious problem", but one which occurs "for the most part" only during labor. He was familiar with some reported cases of maternal death due to "total evacuation of blood". Although he felt that the defendant's clinic was better furnished than most facilities used for saline procedures, he recalled that it was not equipped to handle blood transfusions. In his own practice, Dr. Schulman instructs patients injected with saline to "go to the hospital" when labor begins. He follows this policy "because of the danger that's inherent in this whole process."

Dr. Samuel M. Belinsky testified that he had administered 93 second-trimester saline injections in a treatment room at Fairfax Hospital. As appears from his testimony, Dr. Belinsky considers an out-patient saline injection "a reasonably safe medical procedure"; he agrees that the defendant's clinic is adequately equipped for the procedure; he finds that the complication rates are "about the same" whether the procedure is performed on an in-patient or out-patient basis; he believes it is medically reasonable to release a saline patient following a period of observation, with instructions such as those given by the defendant; and he has some concern about the possibility of patient abuse by hospital staffs.

On direct examination, Dr. Thomas Gressinger concurred generally

in Dr. Belinsky's opinions. On cross-examination, however, he acknowledged that, if the saline solution enters the bloodstream too fast, it may cause "hypernatremia". Although that condition may be corrected before the onset of labor by the body's natural defense mechanisms, he agreed that, when bleeding results, it is a "major medical problem". He noted that Fairfax Hospital maintains a special facility apart from the operating room for delivery of patients injected with saline. Dr. Gressinger, who had administered numerous injections at that hospital, advises his patients to deliver there. He said that the saline process "should be closely supervised and the facility is set up for close supervision." "I feel," he added, "it's the best facility around so I feel it's best for my patients."

Testifying in his own defense, the defendant was of opinion that the saline procedure is the safest method of abortion, that it rarely causes significant complications, that his clinic is properly equipped to perform the procedure, and that the statutory hospital requirement is medically unnecessary for the protection of the patient. The testimony of Dr. Soyster, a witness for the defense, was to the same effect.

It appears that the saline method is the procedure most commonly employed by physicians to induce an abortion in the second trimester. Indeed, "saline amnio-infusion [is] the method of choice" during that stage of pregnancy. See *Colautti* v. *Franklin,* 439 U.S. 379, 398 (1979). And a statutory clause which forbids its use after the first trimester is not reasonably related to maternal health. *Planned Parenthood of Missouri* v. *Danforth,* 428 U.S. 52, 78-79 (1976). But the method employed is not the issue here. Rather, the question is whether the state can require that the method chosen to initiate a second-trimester abortion be performed in a hospital.

As *Roe* and *Doe* teach, once pregnancy has entered the second trimester, the state has a compelling interest in maternal health. In the exercise of the regulatory powers of the state, the legislature may adopt any measure reasonably designed to reduce health hazards inherent in the performance of medical practices.[6] Here, unlike the situation in *Doe,* the medical evidence shows that, from the moment a saline solution is injected to the time the fetus is expelled, the pregnant

---

[6] "The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient. This interest obviously extends at least to the performing physician and his staff, to the facilities involved, to the availability of aftercare, and to adequate provision for any complication or emergency that might arise."
*Roe,* 410 U.S. at 150.

woman is exposed to certain risks[7]—some minor, others major, none precisely predictable. The state is empowered to license and regulate hospitals, clinics, home health agencies, and other medical care facilities, *see generally,* Title 32.1 of the Code, and to fix and enforce different standards of medical care for different facilities. The General Assembly has decided that medical procedures employed in second-trimester abortions must be performed in hospitals. Based upon the evidence in this record, we are of opinion that the hospital requirement is reasonably related to the State's compelling interest in preserving and protecting maternal health.

## B. *Hospital Access*

■ Advancing an alternative theory, the defendant insists that the hospital requirement is constitutionally defective because, he says, it unreasonably limits a pregnant woman's access to medical care and thereby abridges her right under *Roe* to elect to abort. Dr. Soyster testified that only two hospitals in Northern Virginia permit second-trimester abortions, and Dr. Belinsky knew of none in that area that did not require parental consent for abortions on minors. Noting that his patient, a minor, was anxious to conceal her condition from her parents and that she was unable to afford the expense of hospitalization, the defendant maintains that hospital access was "virtually unavailable". This, he argues, shows that the hospital requirement is unreasonable as applied in this State.

The defendant cites two opinions of federal district courts in other states. In *Margaret S.* v. *Edwards,* 488 F.Supp. 181 (E.D. La. 1980), none of the Louisiana hospitals performed second-trimester abortions. In *Planned Parenthood Ass'n of Kansas City* v. *Ashcroft,* 483 F.Supp. 679 (W.D. Mo. 1980), *argued,* No. 80-1130 (8th Cir. Nov. 17, 1980), only one hospital in Missouri did so. But, as acknowledged by the defendant on brief, two hospitals in Northern Virginia and 24 hospitals located elsewhere in the State were providing abortion services in 1977.

More to the point, to the extent access to hospital abortion services was inconvenient or conditioned upon parental consent, the limitations

---

[7] The Attorney General appended to his brief certain medical journals to show additional risks inherent in the use of the saline procedure, and the defendant cited other papers discounting the risks. None of these articles (except one offered by the defendant) was introduced for the benefit of the trial judge. Those outside the record do little more than illustrate diversity of medical opinion, and we do not rely upon them in reaching our decision.

were not obstacles created by the state.[8] While Code § 18.2-75, the so-called "conscience clause", *permits* private hospital corporations to place certain restrictions on abortion services or to refuse them altogether, it does not *require* them to do so. And it need not forbid them to do so. "[A]lthough government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation." *Harris* v. *McRae,* 448 U.S. 297 (1980) (rejecting the contention that denial of public funding of abortion services was an unconstitutional infringement of the right to abort). *See also Poelker* v. *Doe,* 432 U.S. 519 (1977); *Maher* v. *Roe,* 432 U.S. 464 (1977); *Beal* v. *Doe,* 432 U.S. 438 (1977). Applying that rule, we reject the defendant's contention here.

Courts accord legislative enactments a presumption of constitutionality, and the burden rests upon those who question their validity to overcome the presumption. We find that the defendant has not carried his burden, and we hold that the hospital requirement of Article 9 is constitutionally permissible.[9]

## VI. EXCLUDED TESTIMONY

 The defendant proffered, but the trial court excluded, the testimony of Dr. Emily Moore, an expert in demographics and family planning. Dr. Moore had made some 40 telephone calls to Northern Virginia hospitals inquiring about their administrative policies concerning second-trimester abortions. She experienced some difficulty in obtaining responsive and reliable information, but she concluded that only two area hospitals permit second-trimester abortions and that both require parental consent when the patient is a minor.

---

[8] When imposed by the state, spousal and parental consent requirements are unconstitutional. *Danforth,* 428 U.S. at 67-75; *cf. H. L.* v. *Matheson,* 101 S.Ct. 1164 (March 23, 1981) (upholding statutory requirement that physician notify parents of a minor incapable of giving informed consent).

[9] Several other courts have reached a similar conclusion. *See, Gary-Northwest Indiana Women's Services* v. *Bowen,* 496 F. Supp. 894 (N.D. Ind. 1980); *Akron Center for Reproductive Health* v. *City of Akron,* 479 F. Supp. 1172, 1215 (N.D. Ohio 1979); *Wynn* v. *Scott,* 449 F. Supp. 1302 (N.D. Ill.), *aff'd* 559 F.2d 193 (7th Cir.), *appeal dismissed for want of jurisdiction,* 439 U.S. 8 (1978); *Livingston* v. *New Jersey State Board of Medical Examiners,* 402 A.2d 967, *cert. denied,* 81 N.J. 406, 408 A.2d 800 (1979).

While the Supreme Court has never considered a challenge to a second-trimester hospital requirement, the statute reviewed in *Planned Parenthood of Central Missouri* v. *Danforth, supra,* contained such a requirement. Arguably, one of the considerations which led the Court to strike down the proscription against the saline procedure was the knowledge that the law required physicians to perform the procedure in a hospital.

We believe that, entirely aside from the rules on hearsay and best evidence, Dr. Moore's testimony was properly excluded. Its manifest purpose was to reinforce the defendant's position that hospital access was "virtually unavailable". First, the testimony was irrelevant; the defendant's patient testified that she had not sought access to hospital services before she went to the clinic. Second, the testimony was largely cumulative; Dr. Belinsky and Dr. Soyster supplied essentially the same information. Third, under the rule in *Harris* v. *McRae, supra,* Dr. Moore's testimony was immaterial to determination of the constitutionality of the hospital requirement.

\* \* \*

Finding no merit in the defendant's several assignments of error, we will affirm the judgment.

*Affirmed.*