# SIMOPOULOS *v.* VIRGINIA

No. 81–185. Argued November 30, 1982—Decided June 15, 1983

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, and in Parts I and II of which WHITE, REHNQUIST, and O'CONNOR, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, in which WHITE and REHNQUIST, JJ., joined, *post*, p. 519. STEVENS, J., filed a dissenting opinion, *post*, p. 520.

*Roy Lucas* argued the cause for appellant. With him on the briefs was *William P. Marshall.*

*William G. Broaddus*, Chief Deputy Attorney General of Virginia, argued the cause for appellee. With him on the brief were *Gerald L. Baliles*, Attorney General, and *Thomas D. Bagwell* and *Julia Krebs-Markrich*, Assistant Attorneys General.*

*\*Sylvia A. Law, Nadine Taub*, and *Ellen J. Winner* filed a brief for the Committee for Abortion Rights and Against Sterilization Abuse et al. as *amici curiae* urging reversal.

*Dennis J. Horan, Victor G. Rosenblum, Patrick A. Trueman*, and *Thomas J. Marzen* filed a brief for Americans United for Life as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Alan Ernest* for the Legal Defense Fund for Unborn Children; by *Phyllis N. Segal, Judith I. Avner*, and *Jemera Rone* for the National Organization for Women et al.; by *David B. Hopkins* for the American Public Health Association; by *Nancy Reardan* for Women Lawyers of Sacramento et al.; and by *Susan Frelich Appleton* and *Paul Brest* for Certain Law Professors.

508

JUSTICE POWELL delivered the opinion of the Court.

We have considered today mandatory hospitalization requirements for second-trimester abortions in *City of Akron* v. *Akron Center for Reproductive Health, Inc.*, *ante*, p. 416, and *Planned Parenthood Assn. of Kansas City, Mo., Inc.* v. *Ashcroft, ante*, p. 476. The principal issue here is whether Virginia's mandatory hospitalization requirement is constitutional.

I

Appellant is a practicing obstetrician-gynecologist certified by the American Board of Obstetrics and Gynecology. In November 1979, he practiced at his office in Woodbridge, Va., at four local hospitals, and at his clinic in Falls Church, Va. The Falls Church clinic has an operating room and facilities for resuscitation and emergency treatment of cardiac/respiratory arrest. Replacement and stabilization fluids are on hand. Appellant customarily performs first-trimester abortions at his clinic. During the time relevant to this case, the clinic was not licensed, nor had appellant sought any license for it.

P. M. was a 17-year-old high school student when she went to appellant's clinic on November 8, 1979. She was unmarried, and told appellant that she was approximately 22 weeks pregnant. She requested an abortion but did not want her parents to know. Examination by appellant confirmed that P. M. was five months pregnant, well into the second trimester. Appellant testified that he encouraged her to confer with her parents and discussed with her the alternative of continuing the pregnancy to term. She did return home, but never advised her parents of her decision.

Two days later, P. M. returned to the clinic with her boyfriend. The abortion was performed by an injection of saline solution. P. M. told appellant that she planned to deliver the fetus in a motel, and understood him to agree to this course. Appellant gave P. M. a prescription for an analgesic and a "Post-Injection Information" sheet that stated that she had

undergone "a surgical procedure" and warned of a "wide range of normal reactions." App. 199. The sheet also advised that she call the physician if "heavy" bleeding began. Although P. M. did not recall being advised to go to a hospital when labor began, this was included on the instruction sheet. *Id.*, at 200.

P. M. went to a motel. Alone, she aborted her fetus in the motel bathroom 48 hours after the saline injection. She left the fetus, followup instructions, and pain medication in the wastebasket at the motel. Her boyfriend took her home. Police found the fetus later that day and began an investigation.[1]

Appellant was indicted[2] for unlawfully performing an abortion during the second trimester of pregnancy outside of a licensed hospital and was convicted by the Circuit Court of Fairfax County sitting without a jury. The Supreme Court of Virginia unanimously affirmed the conviction. 221 Va. 1059,

---

[1] Except as permitted by statute, persons performing an abortion are guilty of a Class 4 felony under Virginia law and subject to mandatory license revocation. Va. Code §§ 18.2–71, 54–316(3), 54–317(1), 54.321.2 (1982). A Class 4 felony is punishable by a sentence of 2 to 10 years in prison. Va. Code § 18.2–10(d) (1982).

[2] The indictment alleges a violation of Va. Code § 18.2–71 (1982), which provides:

"Except as provided in other sections of this article, if any person administer to, or cause to be taken by a woman, any drug or other thing, or use means, with intent to destroy her unborn child, or to produce abortion or miscarriage, and thereby destroy such child, or produce such abortion or miscarriage, he shall be guilty of a Class 4 felony."

The Virginia Code sets forth four exceptions to this statute: there is no criminal liability if the abortion (i) is performed within the first trimester, § 18.2–72; (ii) is performed in a licensed hospital in the second trimester, § 18.2–73; (iii) is performed during the third trimester under certain circumstances, § 18.2–74; and (iv) is necessary to save the woman's life, § 18.2–74.1. The indictment here alleged a violation of § 18.2–71 and expressly negated any defense of hospitalization under § 18.2–73 and any first-trimester defense under § 18.2–72. The indictment did not, however, rebut the other defenses.

277 S. E. 2d 194 (1981). This appeal followed. We noted probable jurisdiction, 456 U. S. 988, and now affirm.

## II

Appellant raises two issues that do not require extended treatment. He first contends that Va. Code § 18.2–71 (1982) was applied unconstitutionally to him, because lack of medical necessity for the abortion was not alleged in the indictment, addressed in the prosecution's case, or mentioned by the trier of fact. Appellant contends that this failure renders his conviction unconstitutional for two reasons: (i) the State failed to meet its burden of alleging necessity in the indictment, as required by *United States* v. *Vuitch*, 402 U. S. 62 (1971); and (ii) the prosecution failed to meet its burden of persuasion, as required by *Patterson* v. *New York*, 432 U. S. 197 (1977).

The authoritative construction of § 18.2–71 by the Supreme Court of Virginia makes it clear that, at least with respect to the defense of medical necessity, the prosecution was not obligated to prove lack of medical necessity beyond a reasonable doubt *until* appellant invoked medical necessity as a defense. See 221 Va., at 1069, 277 S. E. 2d, at 200. Appellant's reliance on *Vuitch* thus is misplaced: the District of Columbia statute in *Vuitch*, as construed by this Court, required the prosecution to make this allegation. See 402 U. S., at 70. Placing upon the defendant the burden of going forward with evidence on an affirmative defense is normally permissible. See *Engle* v. *Isaac*, 456 U. S. 107, 120–121, and n. 20 (1982); *Mullaney* v. *Wilbur*, 421 U. S. 684, 701–703, nn. 28, 30, 31 (1975).

Appellant also contends that the prosecution failed to prove that his acts in fact caused the death of the fetus. In view of the undisputed facts proved at trial, summarized above, this contention is meritless. See 221 Va., at 1069–1070, 277 S. E. 2d, at 200–201.

## III

We consistently have recognized and reaffirm today that a State has an "important and legitimate interest in the health

of the mother" that becomes "'compelling' . . . at approximately the end of the first trimester." *Roe* v. *Wade*, 410 U. S. 113, 163 (1973). See *City of Akron, ante,* at 428. This interest embraces the facilities and circumstances in which abortions are performed. See 410 U. S., at 150. Appellant argues, however, that Virginia prohibits all nonhospital second-trimester abortions and that such a requirement imposes an unconstitutional burden on the right of privacy. In *City of Akron* and *Ashcroft,* we upheld such a constitutional challenge to the acute-care hospital requirements at issue there. The State of Virginia argues here that its hospitalization requirement differs significantly from the hospitalization requirements considered in *City of Akron* and *Ashcroft* and that it reasonably promotes the State's interests.

## A

In furtherance of its compelling interest in maternal health, Virginia has enacted a hospitalization requirement for abortions performed during the second trimester. As a general proposition, physicians' offices are not regulated under Virginia law.[3] Virginia law does not, however, permit a

---

[3] A physician's office is explicitly excluded from the hospital licensing statutes and regulations unless the office is used principally for performing surgery. Va. Code § 32.1–124(5) (1979). "Surgery" is not defined. Appellant contends that whether his facility principally performs surgery is a question of fact that has not been resolved, and that it is uncertain whether his clinic may be licensed as a "hospital." He notes that *after* he performed the abortion on P. M. he requested a certificate of need, see § 32.1–102.3 (Supp. 1983), but was informed by the Office of the Attorney General that his "clinic-office cannot be licensed as a hospital" and that "if you wish to perform this type of procedure, you must, in essence, build a hospital to do it." App. to Reply Brief for Appellant 3a, 4a. Appellant did not seek a license before he performed the abortion at issue here, nor does he now argue that his clinic would meet the requirements of the Virginia statute and regulations. Rather, he broadly attacks the validity of the state hospitalization requirements as applied to second-trimester abortions. Thus, it is irrelevant to the issue before us whether appellant's clinic and his procedures would have complied with the Virginia regulations.

physician licensed in the practice of medicine and surgery to perform an abortion during the second trimester of pregnancy unless "such procedure is performed in a hospital licensed by the State Department of Health." Va. Code § 18.2–73 (1982). The Virginia abortion statute itself does not define the term "hospital." This definition is found in Va. Code § 32.1–123.1 (1979),[4] that defines "hospital" to include "outpatient . . . hospitals."[5] Section 20.2.11 of the

---

[4] The Supreme Court of Virginia views the word "hospital" in § 18.2–73 as referring to the definition of that term in § 32.1–123.1. This is made clear by the court's general reference in its opinion to Title 32.1 of the Virginia Code, the Title of the Code that contains many of Virginia's health laws:

"The state is empowered to license and regulate hospitals, clinics, home health agencies, and other medical care facilities, *see generally*, Title 32.1 of the Code, and to fix and enforce different standards of medical care for different facilities. The General Assembly has decided that medical procedures employed in second-trimester abortions must be performed in hospitals. Based upon the evidence in this record, we are of the opinion that the hospital requirement is reasonably related to the State's compelling interest in preserving and protecting maternal health." 221 Va., at 1075, 277 S. E. 2d, at 204.

There is no basis for assuming that the court interpreted "hospital" in § 18.2–73 any differently from its interpretation in Title 32.1, and specifically in § 32.1–123.1. See n. 5, *infra*.

[5] Section 32.1–123.1 provides:

" 'Hospital' means any facility in which the primary function is the provision of diagnosis, of treatment, and of medical and nursing services, surgical or nonsurgical, for two or more nonrelated individuals, including hospitals known by varying nomenclature or designation such as sanatoriums, sanitariums and general, acute, short-term, long-term, outpatient and maternity hospitals."

The definition of "hospital" in effect in 1975 when § 18.2–73 was enacted is similar. See Va. Code § 32.298(2) (Supp. 1975) (repealed by 1979 Va. Acts, ch. 711). It specifically included at that time "out-patient surgical hospitals (which term shall not include the office or offices of one or more physicians or surgeons unless such office or offices are used principally for performing surgery)."

## Department of Health's Rules and Regulations for the Licensure of Outpatient Hospitals in Virginia (1977) (regulations)[6]

[6] The regulations were promulgated pursuant to the State Board of Health's general authority to adopt rules and regulations prescribing minimum standards for hospitals. This authority permits it to

"classify hospitals in accordance with the character of treatment, care, or service rendered or offered, and prescribe the minimum standards and requirements for each class in conformity with provisions of this chapter, with the guiding principles expressed or implied herein, and with due regard to and in reasonable conformity to the standards of health, hygiene, sanitation, and safety as established and recognized by the medical profession and by specialists in matters of public health and safety, having due regard to the availability of physicians, surgeons, nurses and other assistants, and the cost and expense to the hospital and the resulting costs to the patients." Va. Code § 32–301 (1973) (repealed by 1979 Va. Acts, ch. 711) (similar rulemaking authority currently is granted in Va. Code §§ 32.1–12 and 32.1–127 (1979)).

The first draft of the regulations differed considerably from the regulations that the Board finally approved. See Department of Health, Draft I, Rules and Regulations for the Licensure of Outpatient Hospitals in Virginia (Oct. 27, 1976). The most important difference was that the requirements now in Part II of the regulations were applicable to all outpatient facilities in which abortions could be performed, regardless of the trimester.

The State Board of Health gave preliminary approval to the proposed regulations on December 1, 1976, and a public hearing was held January 26, 1977. Dr. William R. Hill, a member of the Board, presided at this hearing, and staff present from the Department included two doctors and the Director of the Bureau of Medical and Nursing Facilities Services. Witnesses included the Associate Executive Director of the Virginia Hospital Association; a representative of five outpatient abortion clinics in the State; representatives of two abortion clinics, the Richmond Medical Center and the Hillcrest Clinic; a professor from Eastern Virginia Medical School representing Planned Parenthood of Southside Tidewater and the Tidewater OBGYN Society; the Medical Director of the Ambulatory Surgical Center of Leigh Memorial Hospital; the Administrator of Leigh Memorial Hospital; a representative of the Virginia Society for Human Life; and a representative of the Northern Virginia Medical Center. See Commonwealth of Virginia Department of Health, Public Hearing In Re: Proposed Rules and Regulations for the Licensure of Outpatient Hospitals in Vir-

defines "outpatient hospitals" in pertinent part as "[i]nstitutions . . . which primarily provide facilities for the performance of surgical procedures on outpatients"[7] and provides that second-trimester abortions may be performed in these clinics.[8] Thus, under Virginia law, a second-trimester abor-

ginia (Jan. 26, 1977). The Executive Director of the Virginia Hospital Association stated that "[i]n general, they are a good set of standards and have our support." *Id.*, at 4. The abortion clinics were concerned, however, about the imposition of the regulations on outpatient abortion clinics then performing first-trimester abortions. The clinics acknowledged that during the second trimester "the State may regulate the [abortion] procedure in the interest of maternal health." *Id.*, at 7. But the clinics specifically "propose[d] that clinics or other facilities that perform abortions during the first trimester be specifically excluded from the Rules and Regulations for the Licensure of Outpatient Hospitals in Virginia." *Id.*, at 26. See also *id.*, at 28. The Medical Director of the Ambulatory Surgical Center of Leigh Memorial Hospital, concerned about the need to set high standards for outpatient surgical hospitals in the State, agreed that the Board should not "compromise" the strict standards needed for outpatient surgical hospitals in order to include these first-trimester outpatient abortion clinics within the same set of regulations. See *id.*, at 30. Following the hearing, the Board added Part III, the regulations of which apply only to clinics doing first-trimester abortions. See nn. 8, 12, *infra.* It therefore is clear that Virginia has recognized the need for discrete and different sets of regulations for the two periods. The Board gave its final approval, and the regulations became effective on June 30, 1977. The abortion for which appellant was prosecuted was performed on November 10, 1979, some two years and five months later.

We note that new but similar regulations now supersede the regulations in effect when appellant performed the abortion for which he was prosecuted. See Department of Health, Rules and Regulations for the Licensure of Hospitals in Virginia, Pt. IV (1982). These new regulations were promulgated pursuant to Va. Code §§ 32.1–12, 32.1–127 (1979), enacted in 1979.

[7] Section 32.1–125 of the Code provides: "No person shall establish, conduct, maintain, or operate in this Commonwealth any hospital . . . unless such hospital . . . is licensed as provided in this article." See also Va. Regs. (Outpatient Hospitals) § 30.1 (1977) (similar provision specifically governing outpatient surgical hospitals).

[8] Part II of the regulations sets minimum standards for outpatient surgical hospitals that may perform second-trimester abortions. This interpre-

tion may be performed in an outpatient surgical hospital provided that facility has been licensed as a "hospital" by the State.

The Virginia regulations applicable to the performance of second-trimester abortions in outpatient surgical hospitals are, with few exceptions, the same regulations applicable to all outpatient surgical hospitals in Virginia, and may be grouped for purposes of discussion into three main categories. The first grouping relates to organization, management, policies, procedures, and staffing. These regulations require personnel and facilities "necessary to meet patient and program needs." Va. Regs. (Outpatient Hospitals) § 40.3 (1977); see also § 40.1. They also require a policy and procedures manual, § 43.2, an administrative officer, § 40.6, a licensed physician who must supervise clinical services and perform surgical procedures, § 42.1, and a registered nurse to be on duty at all times while the facility is in use, § 42.2. The second category of requirements outlines construction standards for outpatient surgical clinics, but also provides that "deviations from the requirements prescribed herein may be approved if it is determined that the purposes of the minimum requirements have been fulfilled," § 50.2.1. There are also construction requirements that set forth standards for the public areas, clinical areas, laboratory and radiology serv-

tation is confirmed by several sections in Part II, i. e., §§ 43.6.2, 43.6.3, 43.7.3(c), 43.8.4, 43.8.5, 43.9.5, all of which refer to abortion services, and by the history of Part III, see n. 6, *supra*. Moreover, the State's counsel at oral argument represented that facilities licensed pursuant to Part II legally may perform second-trimester abortions. Tr. of Oral Arg. 33.

Virginia uses the term "outpatient abortion clinics" to refer specifically to those facilities meeting the minimum standards of Part III of the regulations. See Va. Regs. (Outpatient Hospitals) i (1977). Facilities meeting these standards are limited to performing abortions only during the first trimester of pregnancy. *Ibid.* See *id.*, § 62.1.2 ("Any procedure performed to terminate a pregnancy [in an outpatient abortion clinic] shall be performed prior to the end of the first trimester (12th week amenorrhea)").

ices, §§ 52.1, 52.2, 52.3, and general building, §§ 50.6.1, 50.7.1, 50.8.1, 52.4. The final group of regulations relates to patient care services. Most of these set the requirements for various services that the facility may offer, such as anesthesia, § 43.1, laboratory, §§ 43.6.1, 64.1.3, 64.1.4, and pathology, §§ 43.6.3, 64.2.4. Some of the requirements relate to sanitation, laundry, and the physical plant. §§ 43.2, 43.10, 43.11, 43.12.6. There are also guidelines on medical records, § 43.7, preoperative admission, § 43.8, and postoperative recovery, § 43.9. Finally, the regulations mandate some emergency services and evacuation planning. §§ 43.4.1, 43.5.

## B

It is readily apparent that Virginia's second-trimester hospitalization requirement differs from those at issue in *City of Akron, ante,* at 431–432, and *Planned Parenthood Assn. of Kansas City, Mo., Inc.* v. *Ashcroft, ante,* at 481. In those cases, we recognized the medical fact that, "at least during the early weeks of the second trimester[,] D&E abortions may be performed as safely in an outpatient clinic as in a full-service hospital." *City of Akron, ante,* at 437. The requirements at issue, however, mandated that "all second-trimester abortions must be performed in general, acute-care facilities." *Ashcroft, ante,* at 481. In contrast, the Virginia statutes and regulations do not require that second-trimester abortions be performed exclusively in full-service hospitals. Under Virginia's hospitalization requirement, outpatient surgical hospitals may qualify for licensing as "hospitals" in which second-trimester abortions lawfully may be performed. Thus, our decisions in *City of Akron* and *Ashcroft* are not controlling here.

In view of its interest in protecting the health of its citizens, the State necessarily has considerable discretion in determining standards for the licensing of medical facilities. Although its discretion does not permit it to adopt abortion regulations that depart from accepted medical practice, it does have a legitimate interest in regulating second-trimester

abortions and setting forth the standards for facilities in which such abortions are performed.

On their face, the Virginia regulations appear to be generally compatible with accepted medical standards governing outpatient second-trimester abortions. The American Public Health Association (APHA) (Resolution No. 7907), although recognizing "that greater use of the Dilatation and Evacuation procedure makes it possible to perform the vast majority of second trimester abortions during or prior to the 16th week after the last menstrual period," still "[u]rges endorsement of the provision of second trimester abortion in free-standing qualified clinics that meet the state standards required for certification." APHA, The Right to Second Trimester Abortion 1, 2 (1979). The medical profession has not thought that a State's standards need be relaxed merely because the facility performs abortions: "Ambulatory care facilities providing abortion services should meet the same standards of care as those recommended for other surgical procedures performed in the physician's office and outpatient clinic or the free-standing and hospital-based ambulatory setting." American College of Obstetricians and Gynecologists (ACOG), Standards for Obstetric-Gynecologic Services 54 (5th ed. 1982). See also *id.*, at 52 ("Free-standing or hospital-based ambulatory surgical facilities should be licensed to conform to requirements of state or federal legislation"). Indeed, the medical profession's standards for outpatient surgical facilities are stringent: "Such facilities should maintain the same surgical, anesthetic, and personnel standards as recommended for hospitals." *Ibid.*

We need not consider whether Virginia's regulations are constitutional in every particular. Despite personal knowledge of the regulations at least by the time of trial, appellant has not attacked them as being insufficiently related to the State's interest in protecting health.[9] His challenge

---

[9] See nn. 3, 6, *supra;* 5 Record 55–56 (appellant acknowledging existence of the outpatient hospital license; stating that he was seeking a license; but

throughout this litigation appears to have been limited to an assertion that the State cannot require all second-trimester abortions to be performed in full-service general hospitals. In essence, appellant has argued that Virginia's hospitalization requirements are no different in substance from those reviewed in the *City of Akron* and *Ashcroft* cases.[10] At the same time, however, appellant took the position—both before the Virginia courts and this Court—that a state licensing requirement for outpatient abortion facilities would be constitutional.[11] We can only assume that by continuing to challenge the Virginia hospitalization requirement appellant either views the Virginia regulations in some unspecified way as unconstitutional or challenges a hospitalization requirement that does not exist in Virginia. Yet, not until his reply brief in this Court did he elect to criticize the regulations apart from his broadside attack on the entire Virginia hospitalization requirement.

Given the plain language of the Virginia regulations and the history of their adoption, see n. 6, *supra,* we see no reason to doubt that an adequately equipped clinic could, upon

denying that he knew of the licensing program when the abortion was performed).

[10] Appellant's reply brief does criticize the Virginia regulations, but not individually or on specific grounds, instead making only facial challenges in the broadest language and in conclusory terms: that the record is silent on the applicability of those regulations to his facility; that the record does not show whether any outpatient surgical hospitals exist in Virginia or whether, if they exist, they allow second-trimester abortions; that the record is silent on the reasonableness of the regulations; that he had no opportunity to defend against the regulations at trial; that it is uncertain whether, if he had applied for an outpatient hospital license, it would have been granted; that obtaining a license is an arduous process; that Virginia courts have had no opportunity to construe the "licensing statutes and regulations"; and that Part II of the regulations does not cover an outpatient surgical hospital where second-trimester abortions are performed. Some of these arguments are simply meritless, see n. 8, *supra,* and others are irrelevant, see n. 3, *supra,* and none has been raised below.

[11] See 8 Record 196a, 214a; Brief for Appellant in No. 801107 (Va. Sup. Ct.), p. 35; Juris. Statement 16; Brief for Appellant 32, 43, n. 75, 46.

proper application, obtain an outpatient hospital license permitting the performance of second-trimester abortions. We conclude that Virginia's requirement that second-trimester abortions be performed in licensed clinics is not an unreasonable means of furthering the State's compelling interest in "protecting the woman's own health and safety." *Roe*, 410 U. S., at 150.[12] As we emphasized in *Roe*, "[t]he State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." *Ibid.* Unlike the provisions at issue in *City of Akron* and *Ashcroft*, Virginia's statute and regulations do not require that the patient be hospitalized as an inpatient or that the abortion be performed in a full-service, acute-care hospital. Rather, the State's requirement that second-trimester abortions be performed in licensed clinics appears to comport with accepted medical practice, and leaves the method and timing of the abortion precisely where they belong—with the physician and the patient.

IV

The judgment of the Supreme Court of Virginia is

*Affirmed.*

JUSTICE O'CONNOR, with whom JUSTICE WHITE and JUSTICE REHNQUIST join, concurring in part and concurring in the judgment.

I agree with the Court's treatment of the appellant's arguments based on *United States* v. *Vuitch*, 402 U. S. 62 (1971),

---

[12] Appellant argues that Part III of the regulations, covering first-trimester abortion clinics, requires the *same* services and equipment as Part II. In fact, Part III has detailed regulations that do not appear in Part II. See, *e. g.*, Va. Regs. (Outpatient Hospitals) §§ 63.1.1(b), 63.3, 64.2.5(a)–(m) (1977). Appellant contends that, given these extensive regulations for first-trimester abortion clinics, the only way to require *more* technological support for second-trimester abortions would be to restrict them to acute-care, general hospitals. The only issue before us, however, relates to second-trimester abortions.

and *Patterson* v. *New York*, 432 U. S. 197 (1977). Accordingly, I join Parts I and II of the Court's opinion.

I concur in the judgment of the Court insofar as it affirms the conviction. For reasons stated in my dissent in *Akron* v. *Akron Center for Reproductive Health, ante*, p. 416, I do not agree that the constitutional validity of the Virginia mandatory hospitalization requirement is contingent in any way on the trimester in which it is imposed. Rather, I believe that the requirement in this case is not an undue burden on the decision to undergo an abortion.

JUSTICE STEVENS, dissenting.

Prior to this Court's decision in *Roe* v. *Wade*, 410 U. S. 113 (1973), it was a felony to perform any abortion in Virginia except in a hospital accredited by the Joint Committee on Accreditation of Hospitals and licensed by the Department of Health, and with the approval of the hospital's Abortion Review Board (a committee of three physicians).* In 1975, the Virginia Code was amended to authorize additional abortions, including any second-trimester abortion performed by a physician "in a hospital licensed by the State Department of Health or under the control of the State Board of Mental Health and Mental Retardation." Va. Code § 18.2–73 (1982).

The amended statute might be interpreted in either of two ways. It might be read to prohibit all second-trimester abortions except those performed in a full-service, acute-care hospital facility. Or it might be read to permit any abortion performed in a facility licensed as a "hospital" in accord with any regulations subsequently adopted by the Department of

---

*An in-hospital abortion was also unlawful unless (a) it was necessary to protect the life or health of the mother, (b) the pregnancy was the product of rape or incest, or (c) there was a substantial medical likelihood that the child would be born with an irremediable and incapacitating mental or physical defect. 1970 Va. Acts, ch. 508.

Health. The Court today chooses the latter interpretation. See *ante*, at 512–514.

There is reason to think the Court may be wrong. At the time the statute was enacted, there were no regulations identifying abortion clinics as "hospitals." The structure of the 1975 amendment suggests that the Virginia General Assembly did not want to make any greater change in its law than it believed necessary to comply with *Roe* v. *Wade*, and it may well have thought a full-service, acute-care hospitalization requirement constitutionally acceptable. Moreover, the opinion below does not suggest that the Supreme Court of Virginia believed the term "hospital" to incorporate licensed abortion clinics. It only discussed testimony pertaining to full-service, acute-care hospitals like Fairfax Hospital. See 221 Va. 1059, 1073, 277 S. E. 2d 194, 203. And it stated that "two hospitals in Northern Virginia and 24 hospitals located elsewhere in the State were providing abortion services in 1977," *id.*, at 1075, 277 S. E. 2d, at 204, again referring to acute-care facilities. The opinion refers to "clinics" only once, as part of a general statement concerning the variety of medical care facilities the State licenses and regulates; even there, the term is included in the list as a category that is distinct from "hospitals." *Id.*, at 1074, 277 S. E. 2d, at 204.

On the other hand, the Court may well be correct in its interpretation of the Virginia statute. The word "hospital" in § 18.2–73 could incorporate by reference any institution licensed in accord with Va. Code § 32.1–123.1 (1979) and its implementing regulations. See *ante*, at 512–514. It is not this Court's role, however, to interpret state law. We should not rest our decision on an interpretation of state law that was not endorsed by the court whose judgment we are reviewing. The Virginia Supreme Court's opinion was written on the assumption that the Commonwealth could constitutionally require all second-trimester abortions to be performed in a full-service, acute-care hospital. Our decision today in *City of*

*Akron* v. *Akron Center for Reproductive Health, Inc., ante,*
p. 416, proves that assumption to have been incorrect. The
proper disposition of this appeal is therefore to vacate the
judgment of the Supreme Court of Virginia and to remand
the case to that court to reconsider its holding in the light of
our opinion in *Akron.*

I respectfully dissent.