330 F.Supp.2d 820 (2004)
JACKSON WOMEN'S HEALTH ORGANIZATION INC., on Behalf of Itself and Its Patients Seeking Abortions Plaintiff
v.
Brian W. AMY, in His Official Capacity as State Health Officer for the Mississippi State Department of Health and His Agents and Successors; S. Malcolm O. Harrison, in His Official Capacity as Hinds County Attorney and His Agents and Successors; and Haley Barbour, in His Official Capacity as Governor for the State of Mississippi Defendants
No. CIV.A. 3:04CV495LN.
United States District Court, S.D. Mississippi, Jackson Division.
July 22, 2004.
*821 Steven Mark Wann, Maxey Wann, PLLC, Jackson, Simon Heller, Center for Reproductive Rights, New York City, for Plaintiff.
P. Roger Googe, Jr., Office of the Attorney General, Jackson, MS, Sarah E. Berry, Ocean Springs, MS, Mary Jo Woods, Mississippi Attorney General's Office, Jackson, MS, for Defendants.

MEMORANDUM OPINION AND ORDER
TOM S. LEE, District Judge.
This cause is before the court on the motion of plaintiff Jackson Women's *822 Health Organization, Inc. for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. Defendant Brian Amy, in his official capacity as State Health Officer for the Mississippi State Department of Health has responded in opposition to the motion, and the court, having reviewed and considered the parties' arguments and evidentiary submissions, concludes that plaintiff's motion is well taken and should be granted.
Jackson Women's Health Organization (JWHO) filed this action challenging an amendment to Mississippi Code Annotated § 41-75-1. That statute, which previously provided that abortions "on a fetus aged sixteen weeks or more" were required to be performed in licensed hospitals or ambulatory surgical facilities, as amended effective July 1, 2004, now provides that "abortion procedures after the first-trimester shall be performed only at an ambulatory surgical facility or hospitals licensed to perform that service, and for related purposes." JWHO points out that because is not licensed as a hospital or ambulatory surgical facility, then under the amended statute, it no longer may perform abortions from weeks thirteen through fifteen despite the fact that it has been safely performing such abortions for the many years of its existence and despite the fact that it actually meets all the substantive criteria for licensure as an ambulatory surgical facility. JWHO therefore filed this suit alleging that the statute violates the Fourteenth Amendment of the United States Constitution, and by the present motion, seeks a preliminary injunction to maintain the status quo until such time as the court may rule on the merits. For the reasons that follow, the court concludes that the requested injunction should issue.
To prove entitlement to an injunction, plaintiff must establish each of the following elements: "(1) substantial likelihood of success on the merits; (2) substantial threat that plaintiff will suffer irreparable injury; (3) injury outweighs any harm the injunction might cause the defendant; and (4) injunction is in the public interest." Women's Medical Center of Northwest Houston v. Bell, 248 F.3d 411, 419 (5th Cir.2001). The principal, and in fact, only element in dispute between the parties, is whether plaintiff has sustained its burden to prove a substantial likelihood of success on the merits, for the State seems to agree, if only implicitly, that in the event such a showing is made, the remaining elements will also have been met. In the court's opinion, plaintiff has sustained its burden.
While "[t]he Fourteenth Amendment protects a woman's right to choose to terminate her pregnancy prior to viability[,][g]overnment regulation of abortions is allowed so long as it does not impose an undue burden on a woman's ability to choose." Victoria W. v. Larpenter, 369 F.3d 475, 483 (5th Cir.2004)(citing Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 878, 112 S.Ct. 2791, 2821, 120 L.Ed.2d 674 (1992) ("Regulations designed to foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden.")). "A state regulation constitutes an undue burden if it `has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'"[1]Id.
In Casey, the Court made it clear that, "[a]s with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an *823 abortion, but may not impose unnecessary health regulations that present a substantial obstacle to a woman seeking an abortion." 505 U.S. at 837, 112 S.Ct. at 2799. Plaintiff herein does not appear to dispute that the State, in furtherance of its putative interest in protecting the health and safety of women seeking abortions, may validly require that second-trimester abortions be performed in clinics that meet the minimum health and safety standards prescribed for ambulatory surgical facilities in the state. Plaintiff contends, however, that the State here has effectively barred it from performing early second-trimester abortions for reasons wholly unrelated to any actual safety or health concerns, and asserts, moreover, that regardless of whether the amended statute, as interpreted and applied by the State, could fairly be said to further the State's legitimate interest in protecting the health and safety of women seeking abortions, the statute imposes an undue burden on these women. In the court's opinion, plaintiff appears likely correct on both counts and thus has sustained its burden to demonstrate a likelihood of success on the merits of its claims in this cause.
In Simopoulos v. Virginia, 462 U.S. 506, 516-518, 103 S.Ct. 2532, 2539-2540, 76 L.Ed.2d 755 (1983), the Supreme Court observed that "[i]n view of its interest in protecting the health of its citizens, [a] State necessarily has considerable discretion in determining standards for the licensing of medical facilities," and while this discretion "does not permit [a state] to adopt abortion regulations that depart from accepted medical practice, it does have a legitimate interest in regulating second-trimester abortions and setting forth the standards for facilities in which such abortions are performed." Simopoulos, 462 U.S. at 516-518, 103 S.Ct. at 2539-2540.
The Court in Simopoulos reiterated its observation in Roe v. Wade that "`[t]he State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient,'" id. at 511, 103 S.Ct. at 2536 (quoting Roe v. Wade, 410 U.S. 113, 163, 93 S.Ct. 705, 731, 35 L.Ed.2d 147 (1973)), and concluded that "Virginia's requirement that second-trimester abortions be performed in licensed clinics is not an unreasonable means of furthering the State's compelling interest in `protecting the woman's own health and safety,'" id. at 519, 103 S.Ct. at 2540 (quoting Roe, 410 U.S. at 150, 93 S.Ct. at 725). In the words of the Court, "the State's requirement that second-trimester abortions be performed in licensed clinics appears to comport with accepted medical practice, and leaves the method and timing of the abortion precisely where they belong  with the physician and the patient." Id., 103 S.Ct. at 2540.[2]
From this, it is apparent that the State of Mississippi has a legitimate interest *824 from the outset of pregnancy in protecting the health of women seeking abortions, and that this interest is sufficiently important to allow the state to regulate such matters as the facilities in which abortions are performed. However, "health regulations which are unnecessary, i.e., not reasonably related to maternal health or which depart from accepted medical practice, cannot withstand constitutional scrutiny and must be invalidated." Greenville Women's Clinic v. Bryant, 222 F.3d 157, 198 (2000) (Hamilton, J., dissenting) (citing Casey, 505 U.S. at 878, 112 S.Ct. 2791, 120 L.Ed.2d 674, and Akron v. Akron Ctr. for Reproductive Health, 462 U.S. 416, 434-39, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983)).
Unlike the case at bar, the Court in Simopoulos"[saw] no reason to doubt that an adequately equipped clinic could, upon proper application, obtain an outpatient hospital license permitting the performance of second-trimester abortions." Simopoulos, 462 U.S. at 519, 103 S.Ct. at 2540. Here, in contrast, it appears from the record that plaintiff does meet all the substantive standards for licensure that could have had any bearing on the State's putative interest in promoting the health and safety of women who would choose to have an abortion in the earliest weeks of the second trimester, and yet the State has made it plain that this plaintiff cannot obtain the necessary license for reasons wholly unrelated to any such legitimate motivation by the State.
The State Department of Health has taken the position, both in its dealings with JWHO and in its submissions and arguments to the court, that a facility seeking certification as an "ambulatory surgical facility," as contemplated by the amendment to Mississippi Code Annotated § 41-75-1, must first obtain a certificate of need from the Department of Health before it may apply for licensing as an ambulatory surgical facility. However, since JWHO performs only abortions and no other surgical procedures, it would be considered a single-specialty ambulatory surgical facility which is not covered by the certificate of need application process. It therefore cannot obtain a certificate of need; and since it cannot obtain a certificate of need, then it cannot be licensed as an ambulatory surgical facility within the meaning of § 41-75-1.[3] In other words, since plaintiff's *825 singular specialty is abortions, then regardless of whether it meets the substantive health and safety criteria established by the State for licensed ambulatory surgical facilities  and the proof to date is to the effect that it does  it cannot be licensed as an ambulatory surgical facility and hence, under the amendment to § 41-75-1, is prohibited from performing abortions beyond the first trimester.
While in theory, the State's requirement that second-trimester abortions be performed in licensed ambulatory surgical facilities would not be an unreasonable means of furthering the State's interest in protecting the health and safety of women seeking such abortions, in practice, and in practical effect, Mississippi's implementation of this requirement does nothing to further this putative interest. That is to say, assuming that the court is correct in its understanding of the State's interpretation of the applicable statute and Department of Health regulations, it would hardly be reasonable to conclude that the State's effective decision to ban early second-trimester abortions by this plaintiff, without reference to whether it meets the relevant health and safety criteria, does anything to further the State's professed desire to protect the health and safety of women who choose abortion.[4]See Akron v. Akron Center for Reproductive Health, 462 U.S. at 431, 103 S.Ct. at 2481 (the "[s]tate's discretion to regulate on [the basis of maternal health] does not ... permit it to adopt abortion regulations that depart from accepted medical practice.... If a State requires licensing or undertakes to regulate the performance of abortions during this period, the health standards adopted must be legitimately related to the objective the State seeks to accomplish.") (citation and internal quotation marks omitted).
Having said that, even assuming this were an appropriate regulation of abortions by the State, plaintiff has established a substantial likelihood of success on the merits of its claim that this regulation places an undue burden on the exercise of women's right to choose abortion. The parties herein agree that no regular provider of abortion services in Mississippi is currently licensed as a hospital or ambulatory surgery facility.[5] They also agree that no licensed ambulatory surgery facility or private hospital in the state currently performs abortions. And they agree that public hospitals in Mississippi are prohibited by law from performing abortions except in extremely limited circumstances, namely, where necessary to prevent the woman's death, where the pregnancy is the result of rape or incest or in cases of fatal fetal anomalies, see Miss.Code Ann. § 41-41-91. It follows that as matters currently *826 stand, abortions are unavailable in the state of Mississippi beyond the first trimester, except in those limited circumstances in which public hospitals may perform abortions.
As the Casey plurality noted:
A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not to hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.
Casey, 505 U.S. at 877, 112 S.Ct. at 2820.
In Casey, the Supreme Court held that while "a State can require that second-trimester abortions be performed in outpatient clinics, see Simopoulos, 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983)," reiterated its holding in City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 438-439, 103 S.Ct. 2481, 2497, 76 L.Ed.2d 687 (1983), that a State "[cannot] require that such abortions be performed only in hospitals." Casey, 505 U.S. at 949, 112 S.Ct. at 2857. The Court has reasoned in Akron that a hospitalization requirement for all second-trimester abortions significantly increased the expense and inconvenience to the woman without contributing to the safety of the procedure, and that it therefore unreasonably infringed upon a woman's constitutional right to obtain an abortion. Akron, 462 U.S. at 438-439, 103 S.Ct. at 2497; see also Casey, 505 U.S. at 949, 112 S.Ct. at 2857 (explaining its Akron holding, stating, "[d]espite the fact that Roe expressly allowed regulation after the first trimester in furtherance of maternal health, "`present medical knowledge,'" in our view, could not justify such a hospitalization requirement under the trimester framework.").
Here, the State has not affirmatively imposed a hospitalization requirement, but it is nonetheless clear that irrespective of the State's purpose, the effect of the amendment at issue is to make abortions following the first trimester unavailable to women in this State. Cf. Planned Parenthood of Minnesota/South Dakota v. Rounds, 372 F.3d 969, 2004 WL 1373322, *4 (8th Cir.2004) (where proof showed that the only hospital in South Dakota that performed abortions did so only under very limited circumstances, i.e., when the woman's life or health would be significantly endangered by continuing the pregnancy, or when the fetus appears to have serious and uncorrectable medical conditions or genetic disorder, it followed that "hospitals are for all practical purposes unavailable for abortions in South Dakota").
In response to plaintiff's motion, the State points out that it has not prohibited ambulatory surgical facilities from performing abortions and that it cannot force these facilities to perform abortions, so the fact that early second-trimester abortions may be unavailable in Mississippi cannot be attributed to action by the State but rather to the voluntary election of these facilities not to perform abortions. Further, noting that "[n]ot all burdens on the right to decide whether to terminate a pregnancy [are] undue," Casey, 505 U.S. 833, 876, 112 S.Ct. at 2820, 120 L.Ed.2d 674, the State argues that the burden here is slight and permissible. More to the point, it argues that while early second-trimester abortions may not be available in *827 Mississippi, there is no "undue burden" since women who want them may travel out of state to get them. It submits that while this could in some cases result in an increase in the cost of obtaining the procedure and perhaps also cause somewhat of a delay, these "burdens" are not "undue" and hence would not be a sufficient basis for invalidating the amendment.
Although the State obviously has not prohibited existing ambulatory surgical facilities from performing abortions, it was aware when this amendment was adopted that none of the existing ambulatory surgical facilities performs abortions, and thus knew that the effect (if not the intent) of the amendment would be to make second-trimester abortions unavailable in Mississippi. Under applicable authorities, a regulation that has the effect of unduly burdening a woman's right to choose an abortion is constitutionally infirm. Moreover, the court is not persuaded that this burden is adequately ameliorated by the possible availability of abortions in surrounding states. Though neither party has undertaken to show whether, where and in what circumstances abortions may be available in states with reasonably close proximity to Mississippi, the court need not assess whether such abortions would in fact be available, for plaintiff has persuaded the court that the complete unavailability of early second-trimester abortions in Mississippi serves as a substantial obstacle to a woman's choice whether to seek such an abortion.
For the reasons given, the court concludes that plaintiff has sustained its burden to establish a likelihood of success on the merits, and likewise concludes that the remaining requisites for issuance of a preliminary injunction are met. Irreparable harm exists in the fact that the amendment to the statute, if interpreted and applied in the manner of the State's choosing, would infringe the Fourteenth Amendment right of women who would choose abortion early in the second trimester. Cf. Mississippi Women's Medical Clinic v. McMillan, 866 F.2d 788, 795 (5th Cir.1989) (concluding that any denial of a clinic's right to perform abortions would be an irreparable harm). Moreover, given that it is undisputed that plaintiff has been safely performing early second-trimester abortions for years, and at this time appears to meet the substantive criteria that the State has determined will serve to protect the health and safety of women seeking abortions, it cannot reasonably be questioned that the harm that would result from denial of the requested injunction outweighs any harm the injunction might cause the State, and that the injunction is in the public interest.
Accordingly, it is ordered that plaintiff's motion for preliminary injunction is granted.
NOTES
[1] Prior to the Supreme Court's decision in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 878, 112 S.Ct. 2791, 2821, 120 L.Ed.2d 674 (1992), abortion cases considered a woman's right to an abortion in the context of the trimester framework. In Casey, the Court moved away from that and toward a point of reference based on a fetus's nonviability or viability. Id. at 846, 112 S.Ct. at 2804.
[2] The Court stated:

On their face, the Virginia regulations appear to be generally compatible with accepted medical standards governing outpatient second-trimester abortions. The American Public Health Association (APHA), although recognizing "that greater use of the dilatation and evacuation procedure make[s] it possible to perform the vast majority of second trimester abortions during or prior to the 16th [w]eek after the last menstrual period," still "[u]rges endorsement of the provision of second trimester abortion in free-standing qualified clinics that meet the state standards required for certification." APHA, The Right to Second Trimester Abortion 1, 2 (1979). The medical profession has not thought that a State's standards need be relaxed merely because the facility performs abortions: "Ambulatory care facilities providing abortion services should meet the same standards of care as those recommended for other surgical procedures performed in the physician's office and outpatient clinic or the free-standing and hospital-based ambulatory setting." American College of Obstetricians and Gynecologists (ACOG), Standards for Obstetric-Gynecologic Services 54 (5th ed.1982). See also id., at 52 ("Free-standing or hospital-based ambulatory surgical facilities should be licensed to conform to requirements of state or federal legislation."). Indeed, the medical profession's standards for outpatient surgical facilities are stringent: "Such facilities should maintain the same surgical, anesthetic, and personnel standards as recommended for hospitals." Ibid.
Simopoulos v. Virginia, 462 U.S. at 517, 103 S.Ct. at 2539.
[3] As of the date of the hearing on plaintiff's motion, the court understood that while plaintiff's application for licensure as an ambulatory surgical facility was pending, the application would not be granted. Following the hearing, plaintiff forwarded to the court a letter generated by the State Department of Health dated July 14, 2004 denying the application for a license, stating:

[JHWO] currently has a valid license as an abortion facility, and the State Department of Health cannot issue a different license for reasons set forth herein.
Your letter states that you are "only seeking approval to perform abortion services." By statutory definition found in Section 41-75-1 of the Mississippi Code of 1972, a facility that operates substantially for the purpose of performing abortions is an "abortion facility."
A Certificate of Need is a prerequisite to licensure for ambulatory surgical facilities, as set forth in Section 41-7-191 of the Code. In addition, the establishment of a new health care facility requires Certificate of Need review.
[4] Indeed, it strikes the court as odd to suggest, as does the State, that plaintiff should be deemed ineligible for consideration for licensure as an ambulatory surgical facility that can perform second-trimester abortions solely because its specialty, by practice and experience, is abortions, while other facilities, merely because they perform a broad range of surgical services, can be licensed as ambulatory surgical facilities and hence authorized to perform an occasional abortion, despite their lack of specific training and expertise. Assuming that both meet the minimum health and safety standards established by the State for ambulatory surgical facilities, it makes little sense to license the latter to perform abortions while denying such licensure to the former.
[5] There are, in fact, only two regular providers of abortion services in the state  plaintiff and one other  neither of which is licensed as an ambulatory surgery facility.